UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| CHRISTINA ZAMORA, INDIVIDUALLY AND AS NEXT FRIEND OF M.Z.; RUBEN ZAMORA, INDIVIDUALLY AND AS NEXT FRIEND OF M.Z.; and JAMIE TORRES, INDIVIDUALLY AND AS NEXT FRIEND OF K.T., | § § § § § § | CIVIL ACTION NO. 1:23-cv-196 |
| *Plaintiffs,* | § § § | **COMPLAINT FOR DAMAGES** |
| **v.** | § § | (1) Negligence |
| DANIEL DEFENSE, LLC; DANIEL DEFENSE, INC; OASIS OUTBACK, LLC; CITY OF UVALDE; UVALDE CONSOLIDATED INDEPENDENT SCHOOL DISTRICT; UVALDE COUNTY; UVALDE CONSOLIDATED INDEPENDENT SCHOOL DISTRICT POLICE DEPARTMENT ("UCISD-PD") CHIEF PEDRO 'PETE' ARREDONDO; UVALDE POLICE DEPARTMENT ("UPD") LIEUTENANT AND ACTING CHIEF MARIANO PARGAS; FORMER UPD OFFICER AND UCISD SCHOOL BOARD MEMBER JESUS "J.J." SUAREZ; UPD SERGEANT DANIEL CORONADO; UPD OFFICER JUSTIN MENDOZA; UPD OFFICER MAX DORFLINGER; UVALDE COUNTY SHERIFF RUBEN NOLASCO; UVALDE COUNTY CONSTABLE EMMANUEL ZAMORA; UVALDE COUNTY CONSTABLE JOHNNY FIELD;  TEXAS DEPARTMENT OF PUBLIC SAFETY ("TDPS") CAPTAIN JOEL BETANCOURT; TDPS SERGEANT JUAN MALDONADO; TDPS RANGER CHRISTOPHER KINDELL; and DOES 1-119, | § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § | (2) Negligence Per Se (3) Negligent Transfer (4) Negligent Sale (5) 42 U.S.C. § 1983, *et seq.* (6) Punitive/Exemplary Damages  Jury Trial Demanded pursuant to Fed. R. Civ. P. 38(b) |
| *Defendants.* | § § § | |

## PLAINTIFFS' ORIGINAL COMPLAINT

## I.
## <u>INTRODUCTION</u>

1.      M.Z. woke up on May 24, 2022 excited for the day to come—it was awards day at Robb Elementary and she knew that she would receive several awards. Her father, Ruben Zamora, was going to take her to school that day. She planned to leave school after the awards ceremony to continue to spend time with him rather than stay at school. Ruben's work schedule required him to work five days in a row, and then he had the next five days in a row off of work, and M.Z. loved spending time with him working on projects around the house when he was on his off-week at home. Ruben treated M.Z. to a special breakfast on her way to school that day—a Starbucks Vanilla Bean Frappuccino and two bacon, egg, and gouda breakfast sandwiches. Later that morning, both M.Z.'s parents, Ruben and Christina, looked on with pride as she received three awards—for Skills Mastered in Math, for participating in the Robotics Program, and for Excellence in the AB Honor Roll. M.Z. was very proud and excited to have her parents present at the awards ceremony. M.Z. had so much fun at awards day with her friends that instead of leaving afterwards to spend time with Ruben as planned, she changed her mind and decided to stay at school. She knew she only had a few days left to spend with her friends before the summer and she wanted to maximize her time with them.

LM LAW GROUP, PLLC
2806 Fredericksburg Rd., Ste. 118
San Antonio, TX  78201
Tel. 210.396.2045

ORIGINAL COMPLAINT FOR DAMAGES



Ruben Zamora and M.Z. proudly showing off M.Z.'s award certificates.

2.      On the morning of May 24, 2022, K.T.'s dad had to leave early for work in the oil fields, and her mom was away in Oklahoma, so K.T.'s grandmother (who was staying with the family) got K.T. ready for school. K.T. was looking forward to the awards ceremony at the school and the plans that her class had to blow bubbles and fly paper airplane outside. K.T. was new in town, but she had made a good friend in her fourth-grade class, and she was worried that her friend wouldn't have her own bubbles, so K.T.'s grandmother stopped at the store on the way to school so they could buy her friend extra bubbles. The awards ceremony was exciting, and K.T. was

LM LAW GROUP, PLLC
2806 Fredericksburg Rd., Ste. 118
San Antonio, TX  78201
Tel. 210.396.2045

ORIGINAL COMPLAINT FOR DAMAGES

happy and proud to be given an "Outstanding Citizen" award, even though she was so new to her class.

3.      On May 24, 2022, at around 11:30 a.m., Salvador Ramos walked into Robb Elementary in Uvalde, Texas, armed with a Daniel Defense DDM4 V7 rifle and carrying hundreds of rounds of ammunition. He entered a set of connected classrooms (Rooms 111 and 112) where he murdered 19 children and two teachers and wounded at least 17 other children.

4.      Ramos remained in the connected classrooms for a total of 77 minutes from the beginning of his murderous rampage to the end, before the police entered. For more than an hour, hundreds of peace officers from dozens of agencies stood by in the hallway intentionally barricading the kids in the classrooms with the shooter as the children in the classroom bled, died, called 911 for help, and hid under tables in fear.

5.      M.Z. and K.T. were in classroom 112. M.Z. was shot repeatedly, and very nearly died. She had to be airlifted to San Antonio. Her parents spent two months sleeping in her hospital room. She has undergone over sixty surgeries, and she still faces a long road to recovery. K.T. was hit by shrapnel. K.T. knew that she needed to pretend to be dead to survive, so she lay in blood with her eyes open because she saw that her dead and dying classmates had their eyes open. Both K.T. and M.Z. live with fear, anxiety, and distress. They, and all of Uvalde, will never be the same.

6.      Outside of the school, parents and relatives of students amassed as word spread of an active shooter at Robb Elementary School. Uncertain of their loved one's fate, many in the crowd—including M.Z.'s and K.T.'s families—begged for help, pleaded for their children, and some even tried to enter the school themselves to try to rescue their children, only to be restrained, knocked to the ground, and even tased by officers.

LM LAW GROUP, PLLC
2806 Fredericksburg Rd., Ste. 118
San Antonio, TX 78201
Tel. 210.396.2045                                                          ORIGINAL COMPLAINT FOR DAMAGES

7.      Reports soon spread of children whose bodies had to be identified by their clothing because of the destructive nature of the high-power rifle that was used in the shooting. Ramos was able to carry out these heinous actions because he was armed with a destructive weapon modeled after the M4 carbines carried by U.S. armed forces troops.

8.      So how did Salvador Ramos, who had never previously used a firearm, come to buy an assault rifle manufactured by Daniel Defense, a company that most Americans had not heard of before the Uvalde shooting? Through a foreseeable and entirely preventable chain of events set in motion by Daniel Defense.

9.      Daniel Defense marketed its products by using militaristic imagery to suggest that civilian consumers could (and should) use their weapons the way service members are sometimes asked to: to engage in offensive combat missions directed at other humans. They furthered this message by placing their products in *Call of Duty*, and then using social media like Instagram to amplify their product placement, even suggesting that consumers reenact the video games in real life with their products in hand.  Salvador Ramos was an ideal customer for Daniel Defense: young, isolated, troubled, violent, and open to the message that guns can and should be used for illegal purposes. Thus, it was no accident that a young man with a history of violence who associated the military with killing people, and was fascinated with *Call of Duty* purchased a Daniel Defense AR-style rifle to carry out an offensive attack on civilians.

10.      But Daniel Defense is not the only party that played a role in facilitating—or failing to act reasonably to prevent—Ramos' murderous rampage.

11.      The gun store that delivered the Daniel Defense assault rifle to Ramos—Oasis Outback—bears legal responsibility as well.  It was apparent to multiple individuals who saw

LM LAW GROUP, PLLC
2806 Fredericksburg Rd., Ste. 118
San Antonio, TX  78201
Tel. 210.396.2045

ORIGINAL COMPLAINT FOR DAMAGES

Ramos in Oasis Outback that he was not fit to purchase firearms. One customer who saw Ramos at the store remarked that Ramos looked like a school shooter. The owner of Oasis Outback questioned this quiet loner, dressed in all black, on how he could afford the guns and ammunition he was purchasing. But knowing there were these reasons to be concerned, including that Ramos was in a big hurry to acquire thousands of dollars of deadly weaponry within days of turning 18, Oasis Outback nevertheless sold and transferred to him enough guns, accessories, and ammunition to fight off a small army—or, as it tragically turned out, slaughter 19 children and two teachers.

12.     As a federal firearms licensee, Oasis Outback had a legal duty to not sell guns to prospective purchasers who it knew, or reasonably should have known, planned to use them to harm others. Given the many obvious red flags, it was a reckless dereliction of that duty for Oasis Outback to complete Ramos' transactions.

13.     Daniel Defense and Oasis Outback set the stage for the tragedy on May 24, 2022, but the horror was compounded exponentially by the unconscionable failures of the responding law enforcement officers to follow active shooter protocols that required them to immediately engage the gunman without waiting for orders or backup. Even though the first law enforcement responders entered the school building *three minutes* after Ramos, local, state, and federal officers waited *74 additional minutes* before entering the classroom and killing Ramos. Law enforcement has admitted this was "the wrong decision."  Their decision to disregard the safety and well-being of the children and adults in the school—without doubt one of the most tragic failures of law enforcement in U.S. history—meant that Ramos continued killing, and M.Z., K.T., and their classmates lay suffering for an unconscionably long period of time, without access to emergency medical services and rescue (from another law enforcement agency or from private actors) that

LM LAW GROUP, PLLC
2806 Fredericksburg Rd., Ste. 118
San Antonio, TX  78201
Tel. 210.396.2045
ORIGINAL COMPLAINT FOR DAMAGES

might have saved their lives *and* without the possibility of being comforted by their families, who were so close. These delays cost children their lives, prevented access to medical intervention and services, made their physical injuries worse, and compounded their suffering.

14.     Jamie Torres was in Oklahoma when she heard there had been a shooting at Robb. She immediately started driving to Uvalde, but as she panicked, she kept getting lost. Jamie's drive from Oklahoma was the longest day of her life. As she drove the nine seemingly endless hours to Uvalde, she was able to talk to K.T.'s dad, who was in touch with his sister who was at the hospital with K.T. When Jamie's sister-in-law arrived at the hospital, she found K.T. covered from head to toe in her classmates' blood, and with blood and brain matter in her hair. K.T. was hit by shrapnel and transported to the hospital after the shooting. K.T. exhibited the courage that so many law enforcement officers lacked when she risked her own life to call 911 in a bid to stop the shooter. Despite offering to open the door, she was instructed to continue laying on the ground in wait. K.T. bears the scars of the shrapnel that hit her, but she also remains psychologically scarred by what she saw as she lay on the ground of classroom 112 for 77 minutes covered in the blood of her classmates and desperately hoping that she would not be shot.

15.     M.Z. was shot in her chest, arm, and hand. It is a miracle that she did not die as she lay in classroom 112, bleeding, in pain, wondering if help would ever reach her classroom. Seventy-seven minutes of suffering, blood loss, and despair. Her parents searched for her at the school, at the hospital, and at the civic center in increasing terror that their daughter was among the wounded or the dead. They only later learned that, after having been taken from the school in the back of a pickup truck, then transferred to an ambulance, and then taken to Uvalde Memorial Hospital, M.Z. had been belatedly put on a helicopter to the level 1 trauma hospital in San Antonio.

M.Z. lived, but she has undergone upwards of sixty surgeries and has many more months of rehabilitative therapy and surgeries as she recovers. Like K.T., M.Z. was traumatized by what she witnessed inside classroom 112 as law enforcement officers kept her from rescue and life-saving medical treatment for 77 minutes.

## II.
## JURISDICTION AND VENUE

16.     This case is brought under 42 U.S.C. § 1983 and under state law.  Jurisdiction is conferred on this Court based upon 28 U.S.C. § 1331 and 1343.  This Court also has supplemental jurisdiction over Plaintiffs' state law claims and over Defendants under 42 U.S.C. § 1367 because the state law claims are interrelated to the federal claims.

17.     Venue is proper within the Western District of Texas, Austin Division, under 28 U.S.C. § 139(b)(1) and (2) because at least one Defendant resides within this district, Defendants regularly conduct business in this district, and the events and omissions giving rise to Plaintiffs' claims occurred within the district.

## III.
## PARTIES

### A.  Plaintiffs

18.     Plaintiff Christina Zamora is a resident of the State of Texas, and during the time of the events giving rise to the lawsuit, resided in Uvalde, Texas. Christina Zamora is the biological mother of M.Z., one of the children wounded in the Uvalde school massacre, and sues individually and as next friend to Plaintiff M.Z., Minor Child.

19.     Plaintiff Ruben Zamora is a resident of the State of Texas, and during the time of the events giving rise to the lawsuit, resided in Uvalde, Texas. Ruben Zamora is the biological

LM LAW GROUP, PLLC
2806 Fredericksburg Rd., Ste. 118
San Antonio, TX  78201
Tel. 210.396.2045

ORIGINAL COMPLAINT FOR DAMAGES

father of M.Z., one of the children wounded in the Uvalde school massacre, and sues individually and as next friend to Plaintiff M.Z., Minor Child.

20.     Minor Plaintiff M.Z. is a resident of the State of Texas, and during the time of the events giving rise to the lawsuit, resided in Uvalde, Texas. M.Z. was wounded in the Uvalde school massacre and is represented in this lawsuit by next friends Christina Zamora and Ruben Zamora.

21.     Plaintiff Jamie Torres is a resident of the State of Texas, and during the time of the events giving rise to the lawsuit, resided in Uvalde, Texas. Jamie Torres is the biological mother of K.T, one of the children wounded in the Uvalde school massacre, and sues individually and as next friend to Plaintiff K.T., Minor Child.

22.     Minor Plaintiff K.T. is a resident of the State of Texas, and during the time of the events giving rise to the lawsuit, resided in Uvalde, Texas. K.T. was wounded in the Uvalde school massacre and is represented in this lawsuit by next friend Jamie Torres.

## B.  Defendants

23.     Defendant Daniel Defense, LLC, is a Georgia limited liability company that manufactured and marketed the firearm used to wound M.Z. and K.T. Its principal place of business is 101 Warfighter Way, Black Creek, Georgia 31308, where it may be served with process by its registered agent and Chief Executive Officer ("CEO"), Marvin C. Daniel. Daniel Defense, LLC also does business under the name Daniel Defense, Inc., which has an identical control number registered with the Georgia Secretary of State. Collectively, Daniel Defense, LLC and Daniel Defense, Inc. are referred to herein as "Daniel Defense."

24.     Defendant Oasis Outback, LLC ("Oasis Outback"), is a Texas limited liability company that transferred to Salvador Ramos the weapon used to wound M.Z. and K.T. It also sold

LM LAW GROUP, PLLC
2806 Fredericksburg Rd., Ste. 118
San Antonio, TX  78201
Tel. 210.396.2045

ORIGINAL COMPLAINT FOR DAMAGES

Ramos another AR-15-style weapon and hundreds of rounds of ammunition. Its principal place of business is 2900 East Main Street, Uvalde, Texas 78801, and it may be served with process by serving its registered agent and CEO, William R. Klein, at 236 East Nopal Street, Uvalde, Texas 78801.

25.     Defendant City of Uvalde is a municipality organized under the laws of the State of Texas. The Uvalde Police Department ("UPD") is an agency of the City of Uvalde. At all relevant times, the City of Uvalde was charged by law with the administration and operation of the UPD, including employment, control, supervision, discipline, training and practices of the UPD's personnel and employees, and with the formulation of its policies, practices and customs. In addition, the City of Uvalde is responsible for ensuring that the personnel of UPD obeyed the laws of the United States and of the State of Texas. The City of Uvalde is legally responsible for the acts and omissions of the UPD. The City of Uvalde may be served with process through Mayor Don McLaughlin at 101 E. Main Street, Uvalde, Texas 78801.

26.     Defendant Uvalde Consolidated Independent School District ("UCISD") was, at all relevant times, responsible for the care, safety, management, and security of all students, teachers, staff, campuses, and public-school business within its jurisdiction, including Robb Elementary. The Uvalde Consolidated Independent School District Police Department ("UCISD-PD") is an agency of UCISD. At all relevant times, UCISD was charged by law with the administration and operation of the school district and UCISC-PD, including employment, control, supervision, discipline, training and practices of all school district and UCISCD-PD personnel and employees, and with the formulation of its policies, practices, and customs. In addition, UCISD is responsible for ensuring that the personnel of the school district and UCISD-PD obeyed the laws of the United

LM LAW GROUP, PLLC
2806 Fredericksburg Rd., Ste. 118
San Antonio, TX  78201
Tel. 210.396.2045

ORIGINAL COMPLAINT FOR DAMAGES

States and of the State of Texas. UCISD is legally responsible for the acts and omissions of the UCISD. Defendant UCISD may be served with process through its interim Superintendent, Gary Patterson, at 1000 N. Getty Street, Uvalde, Texas 78801.

27.     Robb Elementary was not adequately prepared for the risk of an active shooter on campus. For example, the school's five-foot tall exterior fence was inadequate to impede an intruder; there was a culture of noncompliance with the security policies to lock exterior and internal classroom doors; the school did not treat the maintenance of doors and locks with any urgency; there was poor internet and cellular phone service throughout the building, which impeded the use of warning or alarm systems; and the school's lockdown alert system was overused to alert parents to "bailouts," a term used to describe police car chases involving human smugglers, which sometimes end in crashes and shootouts, so that when there was a more immediate emergency on May 24, 2022, parents and staff were desensitized to the alert.

28.     Defendant Uvalde County is a county organized under the laws of the State of Texas. The Uvalde County Sheriff's Office ("UCSO") is an agency of Uvalde County. The Uvalde County Constables are an agency of Uvalde County. At all relevant times, Uvalde County was charged by law with the administration and operation of the UCSO and Constables, including employment, control, supervision, discipline, training and practices of the UCSO's personnel and employees, and Constables, and with the formulation of its policies, practices and customs. Uvalde County is legally responsible for the acts and omissions of the UCSO and Constables. In addition, Uvalde County is responsible for ensuring that the personnel of UCSO and Constables obeyed the laws of the United States and of the State of Texas. Uvalde County may be served with process

LM LAW GROUP, PLLC
2806 Fredericksburg Rd., Ste. 118
San Antonio, TX  78201
Tel. 210.396.2045

ORIGINAL COMPLAINT FOR DAMAGES

through the County Judge, The Honorable William R. Mitchell, at 100 N. Getty Street, Uvalde, Texas 78801.

29. Defendant Pedro "Pete" Arredondo ("Arredondo") is an individual residing in Texas. At all relevant times, Arredondo was a council member of the City of Uvalde and the Chief of Police for the UCISD-PD. Arredondo, as the chief policymaker, with final policymaking authority, for the UCISD and the UCISD-PD acted, or failed to act, with deliberate indifference to the constitutional rights of Plaintiffs, and the rights of Plaintiffs under state law, and is liable to Plaintiffs. At all relevant times, Arredondo was acting in the scope of his employment, under color of state law, and in his individual and official capacities. Arredondo may be served with process at his home address in the state of Texas. Out of concern for the privacy of the individual Defendants, that address is not included here. Defendant Arredondo is sued in his official and individual capacities.

30. Defendant Mariano Pargas is an individual residing in Texas. At all relevant times, Pargas was a lieutenant and acting chief of the UPD. Pargas, as the chief policymaker, with final policymaking authority for the City of Uvalde and UPD acted, or failed to act, with deliberate indifference to the constitutional rights of Plaintiffs, and the rights of Plaintiffs under state law, and is liable to Plaintiffs. At all relevant times, Pargas was acting in the scope of his employment, under color of state law, and in his individual and official capacities. Pargas may be served with process at his home address in the state of Texas. Out of concern for the privacy of the individual Defendants, that address is not included here. Defendant Pargas is sued in his official and individual capacities.

LM LAW GROUP, PLLC
2806 Fredericksburg Rd., Ste. 118
San Antonio, TX 78201
Tel. 210.396.2045

ORIGINAL COMPLAINT FOR DAMAGES

31.     Defendant Jesus "J.J." Suarez is an individual residing in Texas. At all relevant times, Suarez was a UCISD Board Member and an officer of UPD, acted, or failed to act, with deliberate indifference to the constitutional rights of Plaintiffs, and the rights of Plaintiffs under state law, and is liable to Plaintiffs. At all relevant times, Suarez was acting in the scope of his employment, under color of state law, and in his individual capacity. Suarez may be served with process at his place of employment, Southwest Texas Junior College, at 2401 Garner Field Road, Uvalde, Texas 78801. Defendant Suarez is sued in his individual capacity.

32.     Defendant Daniel Coronado is an individual residing in Texas. At all relevant times, Coronado was a sergeant of the UPD. Coronado, as a sergeant of the UPD acted, or failed to act, with deliberate indifference to the constitutional rights of Plaintiffs, and the rights of Plaintiffs under state law, and is liable to Plaintiffs. At all relevant times, Coronado was acting in the scope of his employment, under color of state law, and in his individual capacity. Coronado may be served with process at his place of employment, UPD, at 964 W. Main Street, Uvalde, Texas 78801. Defendant Coronado is sued in his individual capacity.

33.     Defendant Justin Mendoza is an individual residing in Texas. At all relevant times, Mendoza was an officer of the UPD. Mendoza, as an officer of the UPD acted, or failed to act, with deliberate indifference to the constitutional rights of Plaintiffs, and the rights of Plaintiffs under state law, and is liable to Plaintiffs. At all relevant times, Mendoza was acting in the scope of his employment, under color of state law, and in his individual capacity. Mendoza may be served with process at his place of employment, UPD, at 964 W. Main Street, Uvalde, Texas 78801. Defendant Mendoza is sued in his individual capacity.

LM LAW GROUP, PLLC
2806 Fredericksburg Rd., Ste. 118
San Antonio, TX  78201
Tel. 210.396.2045

ORIGINAL COMPLAINT FOR DAMAGES

34.     Defendant Max G. Dorflinger is an individual residing in Texas. At all relevant times, Dorflinger was an officer of the UPD. Dorflinger, as an officer of the UPD acted, or failed to act, with deliberate indifference to the constitutional rights of Plaintiffs, and the rights of Plaintiffs under state law, and is liable to Plaintiffs. At all relevant times, Dorflinger was acting in the scope of his employment, under color of state law, and in his individual capacity. Dorflinger may be served with process at his place of employment, UPD, at 964 W. Main Street, Uvalde, Texas 78801. Defendant Dorfligner is sued in his individual capacity.

35.     Defendant Ruben Nolasco is an individual residing in Texas. At all relevant times, Nolasco was the Sheriff of Uvalde County. Nolasco, as the chief policymaker, with final policymaking authority, for the County of Uvalde and Uvalde County Sheriff's Office ("UCSO") acted, or failed to act, with deliberate indifference to the constitutional rights of Plaintiffs, and the rights of Plaintiffs under state law, and is liable to Plaintiffs. At all relevant times, Nolasco was acting in the scope of his employment, under color of state law, and in his individual and official capacities. Nolasco may be served with process at his place of employment, 121 E. Nopal Street, Uvalde, TX 78801. Defendant Nolasco is sued in his official and individual capacities.

36.     Defendant Emmanuel Zamora is an individual residing in Texas. At all relevant times, Zamora was an elected Constable. Zamora, as an elected law enforcement officer, acted, or failed to act, with deliberate indifference to the constitutional rights of Plaintiffs, and the rights of Plaintiffs under state law, and is liable to Plaintiffs. At all relevant times, Zamora was acting in the scope of his employment, under color of state law, and in his individual capacity. Zamora may be served with process at his place of employment, 629 Nicholas Street, Uvalde, Texas 78801. Defendant Zamora is sued in his individual capacity.

LM LAW GROUP, PLLC
2806 Fredericksburg Rd., Ste. 118
San Antonio, TX  78201
Tel. 210.396.2045

ORIGINAL COMPLAINT FOR DAMAGES

37.     Defendant Johnny Field is an individual residing in Texas. At all relevant times, Field was an elected Constable. Field, as an elected law enforcement officer, acted, or failed to act, with deliberate indifference to the constitutional rights of Plaintiffs, and the rights of Plaintiffs under state law, and is liable to Plaintiffs. At all relevant times, Field was acting in the scope of his employment, under color of state law, and in his individual capacity. Zamora may be served with process at 700 E. Nopal Street, Uvalde, Texas 78801. Defendant Field is sued in his individual capacity.

38.     Defendant Joel Betancourt is an individual residing in Texas. At all relevant times, Betancourt was a captain of the TDPS. Betancourt, as a captain of the TDPS acted, or failed to act, with deliberate indifference to the constitutional rights of Plaintiffs, and the rights of Plaintiffs under state law, and is liable to Plaintiffs. At all relevant times, Betancourt was acting in the scope of his employment, under color of state law, and in his individual capacity. Betancourt may be served with process at his place of employment, TDPS, 5805 North Lamar Blvd., Austin, Texas 78752. Defendant Betancourt is sued in his individual capacity.

39.     Defendant Juan Maldonado is an individual residing in Texas. At all relevant times, Maldonado was a sergeant of the TDPS. Maldonado, as a sergeant of the TDPS acted, or failed to act, with deliberate indifference to the constitutional rights of Plaintiffs, and the rights of Plaintiffs under state law, and is liable to Plaintiffs. At all relevant times, Maldonado was acting in the scope of his employment, under color of state law, and in his individual capacity. Maldonado may be served with process at his home address in the State of Texas. Out of concern for the privacy of the individual Defendants, that address is not listed here. Defendant Maldonado is sued in his individual capacity.

ORIGINAL COMPLAINT FOR DAMAGES

LM LAW GROUP, PLLC
2806 Fredericksburg Rd., Ste. 118
San Antonio, TX  78201
Tel. 210.396.2045

40.     Defendant Christopher Kindell is an individual residing in Texas. At all relevant times, Kindell was a Ranger of the TDPS. Kindell, as a ranger of the TDPS acted, or failed to act, with deliberate indifference to the constitutional rights of Plaintiffs, and the rights of Plaintiffs under state law, and is liable to Plaintiffs. At all relevant times, Kindell was acting in the scope of his employment, under color of state law, and in his individual capacity. Kindell may be served with process at his home address in the State of Texas. Out of concern for the privacy of the individual Defendants, that address is not included here. Defendant Kindell is sued in his individual capacity.

41.     Defendant Doe 1 is an officer of the UCISD-PD who was present at Robb Elementary on May 24, 2022, and acted, or failed to act, with deliberate indifference to the constitutional rights of Plaintiffs, and the rights of Plaintiffs under state law, and is liable to Plaintiffs. At all relevant times, Doe 1 was acting in the scope of their employment, under color of state law, and in their individual capacity. Doe 1 is sued in their individual capacity.

42.     Defendants Does 2-17 are officers of the UPD who were present at Robb Elementary on May 24, 2022, and acted, or failed to act, with deliberate indifference to the constitutional rights of Plaintiffs, and the rights of Plaintiffs under state law, and are liable to Plaintiffs. At all relevant times, Does 2-17 were was acting in the scope of their employment, under color of state law, and in their individual capacities. Does 2-17 are sued in their individual capacities.

43.     Defendants Does 18-32 are officers of the UCSO who were present at Robb Elementary on May 24, 2022, and acted, or failed to act, with deliberate indifference to the constitutional rights of Plaintiffs, and the rights of Plaintiffs under state law, and are liable to

ORIGINAL COMPLAINT FOR DAMAGES

Plaintiffs. At all relevant times, Does 18-32 were was acting in the scope of their employment, under color of state law, and in their individual capacities. Does 18-32 are sued in their individual capacities.

44.     Defendants Does 33-119 are officers of the TDPS who were present at Robb Elementary on May 24, 2022, and acted, or failed to act, with deliberate indifference to the constitutional rights of Plaintiffs, and the rights of Plaintiffs under state law, and are liable to Plaintiffs. At all relevant times, Does 33-119 were was acting in the scope of their employment, under color of state law, and in their individual capacities. Does 33-119 are sued in their individual capacities.

45.     Defendants Daniel Defense and Oasis Outback are referred to in this complaint as the "Gun Industry Defendants." The remaining Defendants are referred to in this complaint as the "Law Enforcement Defendants." Where applicable, Defendants City of Uvalde, Uvalde Consolidated Independent School District and Uvalde County, and all constituent units thereof, are referred to as "Law Enforcement Municipal Defendants," and Defendants described in paragraphs 29 through 44 are referred to as "Law Enforcement Individual Defendants."

## IV.
## GENERAL ALLEGATIONS

### A.  Daniel Defense's Role in the Uvalde Shooting

46.     This mass shooting was enabled by the illegal, reckless, and negligent actions of Defendant Daniel Defense, which profited from the unfair marketing of its AR-15 rifles, including the DDM4 V7 rifle that Ramos purchased, in a manner that encouraged civilian consumers to illegally misuse their products in offensive, military-style operations.

LM LAW GROUP, PLLC
2806 Fredericksburg Rd., Ste. 118
San Antonio, TX  78201
Tel. 210.396.2045                                       ORIGINAL COMPLAINT FOR DAMAGES

47.     According to the Oversight Committee of the U.S. House of Representatives, "Ninety percent of [Daniel Defense]'s sales are direct to civilian consumers, but the company's marketing emphasizes the tactical nature of its products." This is no accident. Daniel Defense has illegally marketed its rifles to civilian consumers in a manner that implies that civilians can use their weapons for offensive combat-like missions and that appeals to the subset of adolescent and young men attracted to violent combat and military fantasies, thereby increasing the risk that one of these adolescent or young men will use the rifle to perpetrate an act of mass violence.

48.     Daniel Defense's marketing includes militaristic and combat imagery as well as content specifically aimed at young consumers, referencing video games and the irreverent tone of internet meme culture. This has enabled Daniel Defense to appeal to young male civilian consumers, which can in turn translate to market growth by priming young buyers to purchase AR-15-style rifles as soon as they are legally able.

49.     Daniel Defense markets its products to adolescent and young men using a range of channels, including social media content, product placements, and print advertising. For example, Daniel Defense promotes its products heavily on Instagram, a platform with a young user base. The company does not use "age-gating" to limit access to its social media accounts to those who cannot legally purchase guns. Daniel Defense also places its products in video games, and then heavily promotes the video game tie-ins in the company's social media accounts.

50.     Ramos was the perfect customer for Daniel Defense: a troubled, violent loner who spent much of his free time on the internet and social media and who fantasized about reenacting video game combat in real life. Daniel Defense knew the risks of its marketing strategy and, like Ramos, was drawn to notoriety. The shooting at Robb Elementary was an all-too-foreseeable

outcome of Daniel Defense's decision to market its products in a manner that encouraged their illegal misuse.

### The DDM4 V7 is a Military-Inspired Rifle

51.     Daniel Defense currently manufactures and sells over two dozen models of semiautomatic rifles, including 21 models of AR-15-style rifles and eight large-caliber models of AR-10-style rifles. Unlike many manufacturers of firearms, Daniel Defense sells its firearms directly from its website (in addition to selling through third-party sellers).

52.     The DDM4 V7 rifle—the assault rifle used by Salvador Ramos—comes equipped with a high-capacity, 32-round magazine and a magazine well that is designed "for the fastest, most secure reloads possible." On its website, Daniel Defense has explained that the "M4" in "DDM4 V7" is a nod to the "iconic M4 carbine used by U.S. military forces," after which Daniel Defense models its DDM4 rifles. The company describes it as "extremely maneuverable and easy to move around barriers" in a promotional video for the DDM4 V7 on its website.

53.     Like all AR-15-style rifles, Daniel Defense's DDM4 V7 rifle is descended from military rifles developed for combat. AR-15-style rifles now sold in the civilian market, including Daniel Defense's models, are based on military rifles designed to kill soldiers on the battlefield.

54.     Faced with the task of marketing $2,000 AR-15-style rifles with limited legitimate civilian uses beyond the shooting range, Daniel Defense chose to promote their illegal and dangerous misuse.

### Marketing the Illegal Misuse of Military Combat Weapons to Civilian Young Men

55.     Daniel Defense regularly promotes its weapons and accessories through appeals to civilian consumers attracted to the military and thrill, excitement, and violence of combat. While

LM LAW GROUP, PLLC
2806 Fredericksburg Rd., Ste. 118
San Antonio, TX  78201
Tel. 210.396.2045

ORIGINAL COMPLAINT FOR DAMAGES

many companies employ marketing that extols the virtues of military service, Daniel Defense's marketing illegally promotes the company's AR-15-style rifles in a context that implies they may be used by civilians for offensive, combat-like missions. Stated differently, their advertisements encourage civilian viewers to imagine that, once they purchase a Daniel Defense rifle, they will be just like U.S. soldiers—engaging in combat operations.



*Image from Daniel Defense 2022 print catalog (catalog is available for viewing on the website)*

56.     Other Daniel Defense ads contain imagery suggesting even more explicitly that their rifles can be used by civilians for combat-style operations against non-combatants, including a picture featuring a bolt-action rifle taken through a rifle scope on a rooftop, targeting a car on a public street as if to carry out an assassination. An Instagram user asked, in response to the "Rooftop Ready" post: "Is this an assassins setup? And can I buy this?" Daniel Defense's official account's response was to suggest that "anyone" could use this "assassin's setup": "More geared

---

LM LAW GROUP, PLLC
2806 Fredericksburg Rd., Ste. 118
San Antonio, TX  78201
Tel. 210.396.2045

toward MIL/LE but adaptable to anyone. Yes, our Delta 5 Pro 16" is live on our site right now!"

(MIL/LE is a reference to military and law enforcement).



*Instagram* (Mar. 2, 2022)

57.    Another advertisement, captioned "Saturdays are for the boys," shows three men in

military fatigues, weapons drawn as they climb a set of stairs on a freight ship, as if in a combat

situation. The implicit message: *you*, the civilian consumer, should reenact wartime exercises with

*our* guns. This social media post also expressly states that these advertisements are intended for

"the boys"—that is, young men.

LM LAW GROUP, PLLC
2806 Fredericksburg Rd., Ste. 118
San Antonio, TX  78201
Tel. 210.396.2045



*Facebook (Mar. 13, 2021)*

58.     Other marketing focuses on the use of Daniel Defense's AR-15-style rifles by the

military and for offensive, military-style missions, even though the targeted audience is clearly the

civilian market. For instance, the company uses its social media presence to encourage "MK18

Mondays." In the following post, the company pairs its MK18 rifle with a handgun equipped with

a flashlight and a camouflage combat vest that carries three large-capacity magazines and is

emblazoned with a U.S. flag. Among the hashtags are #gunporn, which appeals to younger

consumers and encourages violent fantasies, and #cqbr, which the company assumes its followers

will understand to refer to "close quarter battle receiver," which is an adaptation to the M4 rifle

ORIGINAL COMPLAINT FOR DAMAGES

used by the military in close combat. Again, the company is suggesting that *civilian* consumers should imagine themselves in close combat with the company's AR-15-style rifles.



*Instagram (Oct. 11, 2021)*

59.     In the following post, Daniel Defense exhorts that those who don't participate in "MK18 Mondays" are "missing out."

LM LAW GROUP, PLLC
2806 Fredericksburg Rd., Ste. 118
San Antonio, TX  78201
Tel. 210.396.2045



*Instagram (Sep. 27, 2021)*

60.     The company's marketing sometimes intersperses online meme culture with combat imagery to sell military-grade weaponry to the civilian population. In the following two posts, the company trades on the "Heading into the weekend like" meme:



*Instagram (May 6, 2021)*



*[Instagram](#)* *(June 25, 2021)*

61.     Along with Instagram content and print advertisements, Daniel Defense has produced videos depicting fictional military service members using its weapons and uses these videos to market its AR-15 rifles to civilians.

62.     In one such video posted on the company's website and on YouTube, Daniel Defense introduced a "revolutionary" new rifle that pairs the company's "DD4 lower receiver" with its rail system "modeled after the proven RIS II developed for SOCOM." A rail system on an AR-15-style rifle allows users to mount various optics—including iron sights, scopes, and holographic sights—as well as lights, aiming lasers, grips, and other accessories in various positions along the length of the rail system. In general, it allows consumers to customize their AR-15-style rifles. The marketing pitch assumes that the target civilian consumer understands, without being told, that "SOCOM" stands for "Special Operations Command," and trades on the cachet of our nation's special operations soldiers. The video intercuts footage of a civilian target

LM LAW GROUP, PLLC
2806 Fredericksburg Rd., Ste. 118
San Antonio, TX  78201
Tel. 210.396.2045

ORIGINAL COMPLAINT FOR DAMAGES

shooter with footage of what appears to be an armed military team moving in formation, all set to a pounding rhythm. But there is no "don't try this at home" warning; the message of this advertisement is the opposite: "This could be you!"



*Still image from Daniel Defense promotional video. [YouTube](#) (Jan. 18, 2022)*

63.     Another video below portrays a (fictional) military raid on a campus of abandoned buildings, one of which appears to be a former school building. It features sweeping shots of a dramatic helicopter arrival, professional stunt work, and suspense-building soundtrack, all in the name of promoting Daniel Defense's rifles as military-grade, special-operations-approved weapons available to civilians.

LM LAW GROUP, PLLC
2806 Fredericksburg Rd., Ste. 118
San Antonio, TX  78201
Tel. 210.396.2045



*Still image from Daniel Defense promotional video.* [YouTube](#) *(Jan. 9, 2017)*

64.     Daniel Defense's video marketing frequently depicts military and law enforcement operations and/or gear encouraging the civilian consumer to "use what they use." While the U.S. government does buy certain firearm components from Daniel Defense (including rail systems), the only publicly available documentation indicates that, aside from an $87,000, limited-time contract for the sale of rifles to the U.S. Navy in 2018, the company does not in fact sell its complete rifles or firearms to the military.

65.     Nevertheless, Daniel Defense has chosen to aggressively market its rifles so that consumers will associate them with the U.S. and foreign militaries. The company's strategy is to position itself as a purveyor of weapons trusted by real-life soldiers, thereby making the military aspirations, or fantasies, held by many civilian consumers—and particularly young male consumers—seem achievable. Daniel Defense's marketing impermissibly and unfairly suggests

LM LAW GROUP, PLLC
2806 Fredericksburg Rd., Ste. 118
San Antonio, TX  78201
Tel. 210.396.2045

ORIGINAL COMPLAINT FOR DAMAGES

that consumers should use Daniel Defense rifles to reenact combat ("extremely maneuverable and easy to move around barriers"), even on American streets. For a young consumer, like Salvador Ramos, who is attracted to the excitement and risk of combat missions and highly susceptible to suggestive marketing, Daniel Defense offers civilians a taste of the military experience via its weapons.

### Marketing Through Video Games

66.     Daniel Defense also markets its rifles' placement in violent first-person-shooter video games. This form of marketing appeals to young, disaffected men, a demographic that is particularly susceptible to be influenced by violent imagery. It amplifies this product placement through online and social media channels. The Daniel Defense DDM4 V7S rifle—a short-barreled version of Ramos's DDM4 V7—is featured in *Call of Duty: Modern Warfare*, and the company's social media account references and tags *Call of Duty* in many of its posts:



*Facebook* (Oct. 25, 2019)



*Caption reads: "The circle is closing…," a reference to an obstacle called "Circle Collapse" that occurs in* Call of Duty: Warzone. Instagram *(June 7, 2021)*

67.     *Call of Duty* is a video game that allows users to have a "first-person" experience of being in the military. That is to say, it gives the user a point-of-view experience of shooting at others as if in combat. It simulates being in a war zone, and one can use AR-15 rifles styled after those made by Daniel Defense in the game. Violent first-person-shooter video games like *Call of Duty* allow Daniel Defense to indirectly market the firepower of their DDM4 V7 to teenagers and young adults through product insertion and realistic depictions of their rifle. The allure of the video game is that it allows users to experience extreme carnage through fantasy killing. Games like *Call of Duty* are popular among teenagers and young adults, including the Uvalde, Parkland, and El Paso mass shooters. And Daniel Defense has benefited from the use of AR-15-style rifles in *Call of Duty*. In social media posts, Daniel Defense uses hashtags such as #callofduty and #cod to make its *Call of Duty* references explicit.

LM LAW GROUP, PLLC
2806 Fredericksburg Rd., Ste. 118
San Antonio, TX  78201
Tel. 210.396.2045

ORIGINAL COMPLAINT FOR DAMAGES

68.     Daniel Defense promotes its connection to the *Call of Duty* franchise with staged photos in its social media feeds, featuring actors dressed up like video game avatars on sets designed to look like settings within the game, holding Daniel Defense products. The not-subtle message to young consumers (like Salvador Ramos) is that Daniel Defense products can be used to reenact *Call of Duty* fantasies.



*Caption reads: "Verdansk never looked so good. Tag your Duos buddy below!" "Verdansk" is the name of a fictional city in the* Call of Duty *franchise. "Duos" is a term referring to a pair of people who play a video game together in a specific "duos" game mode.* Instagram *(May 26, 2021)*

## Pop Culture and Marketing to Teens

69.     Daniel Defense directs much of its marketing—including marketing that suggests that consumers should illegally use its products to carry out combat operations—at teens and young men, who are a population that is likely to be influenced by the militarist imagery displayed above. This compounds the harms of their marketing strategy.

70.     Daniel Defense's marketing draws on pop culture themes and relies on online meme culture to attract teens, many of whom are too young to legally purchase a firearm. The company has engaged in marketing stunts to generate "viral" internet activity and publishes content referencing celebrities and pop culture characters that are popular with teenagers. Coupling this marketing that suggests that Daniel Defense Weapons are suitable for offensive civilian usage with viral meme content links the militaristic marketing to the population most likely to succumb to it. This strategy makes it more likely that the demographic most likely to be susceptible to the message that these weapons are suitable for offensive use—young men—are the ones who are likely to view and internalize this message.

71.     Daniel Defense uses these viral meme tactics to sell highly lethal weapons—the kind that are often used by young, disturbed mass shooters. Daniel Defense knew that young people who this sort of marketing targets have used AR-15-style rifles in mass shootings from Sandy Hook to Buffalo to El Paso to Dayton to Parkland.

72.     For example, on Halloween of 2021, Daniel Defense tweeted out this picture of a tattooed man wearing a jack-o-lantern on his head, carrying a Daniel Defense rifle, and packing several additional large-capacity magazines in a carrier on his chest. The caption of the post asked viewers what costume they had chosen. This sort of content that actively engages users by asking them to comment on the post—and suggesting pranks they might play—appeals to the younger user base of Instagram.

ORIGINAL COMPLAINT FOR DAMAGES

LM LAW GROUP, PLLC
2806 Fredericksburg Rd., Ste. 118
San Antonio, TX 78201
Tel. 210.396.2045



*Twitter* (Oct. 31, 2021)

73.     The same goes for this image of Santa Claus, smoking a cigar and holding a Daniel Defense MK18 assault rifle. The image upends traditional Christmas imagery mixing military themes with Santa Claus—a childhood icon. This form of mixing jokes and pranks with the hypermasculine has particular appeal to a subset of teens and young men.

LM LAW GROUP, PLLC
2806 Fredericksburg Rd., Ste. 118
San Antonio, TX  78201
Tel. 210.396.2045

ORIGINAL COMPLAINT FOR DAMAGES



*Instagram* (Dec. 27, 2021)

74.     The company also uses images from popular (and violent) TV shows and movies in its marketing. In one post, the company features a photograph of an actor dressed up like a guard or executioner, with the caption, "#SquidGame would've been better if they used MK18s." The implication? This ultraviolent show would have had a higher body count if they'd use Daniel Defense's products.

LM LAW GROUP, PLLC
2806 Fredericksburg Rd., Ste. 118
San Antonio, TX  78201
Tel. 210.396.2045



*Individual dressed as an executioner from* Squid Game*, a hyperviolent Netflix show.* _Instagram_
*(Oct. 31, 2021)*

75.     The company also appeals to younger consumers by posting images of celebrities

holding its products, as in the image below of musician Post Malone, which is captioned, "MK18

got me feeling like a rockstar," and is followed by two emojis. The post also uses the #gunporn

and #pewpew hashtags, both of which are designed for younger consumers immersed in online

culture.



*Image of Post Malone, a popular musician and producer, holding a Daniel Defense rifle.*
*Instagram (Jan. 23, 2020)*

**Daniel Defense's Marketing Causes Harm**

76.     Teenagers and young men comprise a disproportionate share of the nation's most destructive mass shooters. They are the group most likely to internalize Daniel Defense's promotion of the illegal offensive civilian use of rifles. Daniel Defense markets AR-15-style rifles against the backdrop of decades of mass shooters selecting these rifles to commits acts of horrific violence.

77.     From Parkland to El Paso to Uvalde, AR-15-style rifles have been the weapon of choice for the young male shooters who disproportionately commit the most destructive mass shootings.  Daniel Defense knew these facts.

LM LAW GROUP, PLLC
2806 Fredericksburg Rd., Ste. 118
San Antonio, TX  78201
Tel. 210.396.2045

ORIGINAL COMPLAINT FOR DAMAGES

78. Through its marketing, Daniel Defense exploits the heightened susceptibility of teenage boys and young men to produce advertising that plays on this group's propensities for risky and violent behavior.

79. This marketing strategy was to court controversy, seek out meme-able content, and push out violent, combat imagery that was certain to appeal to young, video-game-playing men and boys, like Salvador Ramos.

80. In directing much of its advertising at young men and adolescents, Daniel Defense chose to target a group that was particularly susceptible to advertising and disproportionately likely to misuse Daniel Defense's products.

81. Decades of scientific evidence demonstrate that the onset of intense, thrill-seeking urges associated with puberty outpaces the development of the area of the brain responsible for judgment and impulse control, which continues into young adulthood. As a result, adolescents and post-adolescents have less capacity for mature judgment and self-control than older adults and are more likely to engage in risky behaviors. Adolescents and young men are particularly receptive to advertisements that depict impulsive, thrill-seeking behavior.

82. Negative emotions such as anger, depression, and anxiety—which are more strongly felt by adolescents—can dilute the already weak control adolescents and post-adolescents exercise over their impulses and urges.

83. At the same time, adolescents and young adults are more likely than other age groups to engage in risky, thrill-seeking, violent, and impulsive behavior. Young people's predilection for risky, thrill-seeking behavior extends to violent criminal behavior. A disproportionate amount of violent crime in the United States is committed by individuals between

LM LAW GROUP, PLLC
2806 Fredericksburg Rd., Ste. 118
San Antonio, TX 78201
Tel. 210.396.2045

ORIGINAL COMPLAINT FOR DAMAGES

the ages of 15 and 24, and 18- to 20-year-olds are offenders in gun homicides at a rate nearly *three times higher* than adults 21 and older.

84.     Daniel Defense knew that certain adolescents and young adult men are susceptible to advertising that plays on negative emotions and are particularly at risk of misusing AR-15 rifles, including the DDM4 V7.

85.     Despite this knowledge, Daniel Defense continued to market the DDM4 V7 in a manner that would appeal to thrill-seeking young men, who wanted the power and destruction of a military weapon, fully knowing and appreciating that the increase in sales of DDM4 V7 was due in part to its appeal to a younger demographic of users. Daniel Defense's continuation of this marketing foreseeably led to the mass shooting in Uvalde.

**B. The Shooter: Salvador Ramos**

86.     Salvador Ramos was a troubled and violent young man.

87.     In the fall of 2021, Ramos was 17 years old, but he had only progressed as far as ninth grade in school. As a result of poor academic performance and attendance, he was involuntarily withdrawn from Uvalde High School on October 28, 2021.

88.     Following his withdrawal from high school, Ramos became increasingly socially withdrawn. His sister had graduated from high school and moved away. He had always struggled socially, and a close friend moved away to San Antonio. His relationship with a girlfriend ended, and he began harassing his ex-girlfriend and her social circle. His few remaining friends teased him that he would become a school shooter. He became fixated on notoriety.

89.     Ramos had long had a poor relationship with his mother, with whom he lived. In 2022, things worsened. According to a report issued by the Investigative Committee on the Robb

LM LAW GROUP, PLLC
2806 Fredericksburg Rd., Ste. 118
San Antonio, TX  78201
Tel. 210.396.2045

ORIGINAL COMPLAINT FOR DAMAGES

Elementary Shooting of the Texas House of Representatives (the "Robb Committee Report"), in early 2022, Ramos livestreamed "a blowout argument" with his mother, and not long after, he moved into his grandmother's home in Uvalde, located just blocks away from Robb Elementary.

90.    Ramos associated military service with killing people, an association recounted by a former friend and one that may have been heightened by Ramos's obsession with first-person-shooter games like *Call of Duty*. Games like *Call of Duty* can have an outsized influence on the lives of teenagers, particularly teenagers like Ramos who are socially isolated and have difficult home lives. Further, according to the Robb Committee Report, "Those with whom he played videogames reported that he became enraged when he lost. He made over-the-top threats, especially towards female players, whom he would terrorize with graphic descriptions of violence and rape."

91.    Ramos' hatred towards women and obsession with violence against women and girls can be seen through his interactions on social media and through text messages he sent to young women. He sent explicit messages to other people, especially women and girls, online, and he also frequently threatened girls he met online with sexual assault. He became increasingly drawn to violent, sexual content, as well as videos of suicides and beheadings. Even his usernames and email address "reflected themes of confrontation and revenge," according to the Robb Committee Report.

92.    In early 2022, Ramos began making plans to carry out a school shooting in Uvalde. At the time he started planning, Ramos was 17 years old and thus could not legally purchase guns or ammunition. He asked other people to buy guns for him, which they refused to do. Instead, he began purchasing accessories, including large-capacity magazines, a holographic weapon sight,

LM LAW GROUP, PLLC
2806 Fredericksburg Rd., Ste. 118
San Antonio, TX  78201
Tel. 210.396.2045

ORIGINAL COMPLAINT FOR DAMAGES

and a Hellfire trigger system (which dramatically increases the rate of fire of a semiautomatic firearm and makes it operationally similar to a fully automatic firearm). He searched online for how to purchase "juggernaut armor," which exists only in *Call of Duty*.

**C. Daniel Defense's Illegal Marketing Was a Proximate Cause of Harms to Plaintiffs.**

93.    Daniel Defense's marketing of its rifles to teenage and young adult men contributed to the shooting at Robb Elementary, and is responsible, in part, for the injuries to M.Z. and K.T. Daniel Defense markets its AR-15-style rifles to young male consumers by using militaristic imagery and video game references, by marketing on various social media platforms, and by suggesting that its rifles can be used by civilians for offensive combat-style operations against non-combatants. These advertisements were tailor-made for someone like Salvador Ramos: a loner with a history of making violent threats, fantasies of notoriety, and a fixation on video games (including *Call of Duty*), violence, and gore, and someone who was a prolific user of social media, including but not limited to Instagram.

94.    Daniel Defense's unfair and illegal marketing tactics worked. The company was not a household name, and Salvador Ramos knew little about guns and had never fired one previously, but he went to Daniel Defense's online store, instead of a website that sold multiple brands/manufacturers' products. This was not chance or a coincidence; nor was it typical. Instead, on information and belief, it was exposure to Daniel Defense's marketing, as described above, that influenced Ramos and led him to steer his web browser to DanielDefense.com and decide to purchase and then use one of their most lethal weapons, paying over $2,000 for a gun that he had neither held nor fired. Of course, he had *virtually* fired rifles styled after those made by Daniel Defense many times in video games and in his imagination.

LM LAW GROUP, PLLC
2806 Fredericksburg Rd., Ste. 118
San Antonio, TX  78201
Tel. 210.396.2045

ORIGINAL COMPLAINT FOR DAMAGES

95.     A week after he purchased the Daniel Defense DDM4 V7, Salvador Ramos used it to carry out the massacre he had been planning for months.

96.     The Daniel Defense DDM4 V7, a semiautomatic rifle that accepts detachable high-capacity magazines, enabled Salvador Ramos to discharge many rounds over short periods of time. Ramos ultimately fired well over 100 rounds.

97.     In addition to their high rates of fire, AR-15-style rifles like the DDM4 V7 discharge rounds that are larger and travel much faster than handgun bullets. This combination means these bullets have more kinetic energy. When that bullet hits a person, this kinetic energy translates to more lethal damage to the human body. While handgun bullets typically travel in a linear path through the body and create relatively small entry and exit wounds, AR-15 rounds hit the human body with such speed that they can shred organs, destroy large swaths of tissue, and leave exit wounds the size of an orange.

98.     And destruction it wrought. The bodies of several victims, disfigured beyond recognition, were identified by their DNA; one 10-year-old victim's body was identified based on her green Converse sneakers. M.Z.'s right hand was nearly torn apart by a bullet from the DDM4 V7, and she has undergone numerous reconstructive procedures on that hand.

99.     Salvador Ramos pulled the trigger of the DDM4 V7 that killed, wounded, and traumatized the teachers and students of Robb Elementary. Daniel Defense's unfair and irresponsible marketing tactics put their assault rifle in Salvador Ramos's mind, delivered it into his hands, and influenced him to select it to carry out a horrific massacre, resulting in more carnage and worse suffering.

100.     K.T., M.Z., and their families could not reasonably avoid the destruction caused by Daniel Defense's illegal marketing. Plaintiffs are school children and parents who are consumers—they purchase pens, pencils, erasers, notebooks, sneakers, and backpacks, among other things, as part of the educational process.  But none of that—or anything else—allows them to reasonably avoid the harms from a young man armed with a Daniel Defense assault rifle, encouraged by Daniel Defense's marketing, and intent on carrying out a school massacre. Mass shootings occur in schools across Texas and the United States with alarming frequency. Children in schools routinely undergo active shooter trainings, but they cannot avoid being in places where they are at risk of mass shootings, and their parents, too, have no way of ensuring that their children avoid these injuries. They cannot avoid the consequences of Daniel Defense's illegal marketing campaigns.

101.     The risk of these catastrophic harms occurring again could be reduced if Daniel Defense took reasonable steps to reform its marketing. Daniel Defense could tailor its marketing to less vulnerable purchasers, cease the use of combat imagery, and/or highlight the serious known dangers associated with its weapons. These would not be burdensome reforms. And such reforms could prevent future mass shootings.

102.     Daniel Defense's marketing tactics are unfair and violate the Federal Trade Commission Act.

### D. Oasis Outback's Negligence in Transferring Firearms and Ammunition to Ramos Was a Proximate Cause of Harm to Plaintiffs.

103.     On his eighteenth birthday, May 16, 2022, Ramos went online and made two purchases. First, he paid $1,761.50 to purchase 1,740 rounds of ammunition for use in an AR-15 rifle from an online retailer. And second, he steered his browser to Daniel Defense's webstore,

where he ordered a DDM4 V7 AR-15-style rifle. Ramos requested that the DDM4 V7 be shipped to Oasis Outback, a gun store in Uvalde. Ramos paid $2,054.28 to purchase the rifle.

104. The next day (May 17), Ramos went to Oasis Outback in person and bought a Smith & Wesson M&P15 assault rifle for $1,081.42.

105. The day after that (May 18), Ramos went to Oasis Outback to buy an additional 375 rounds of AR-15 ammunition.

106. And then Ramos returned to Oasis Outback again two days later (May 20) to pick up his Daniel Defense assault rifle. Upon information and belief, Ramos paid a $50 transfer fee to Oasis Outback to pick up this rifle. This was his third visit to the store in a four-day period. In that short period, Ramos had picked up or bought well over $3,000 worth of guns and ammunition, including two AR-style rifles. Oasis Outback was required to report this multiple sale of rifles to the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") pursuant to a letter issued by the ATF on July 12, 2011. Fulfilling its reporting requirements, however, would not have absolved Oasis Outback of its obligation to block a sale on other relevant grounds, including when Oasis Outback knew or reasonably should have known that the purchaser was likely to harm himself or others.

107. On Ramos' May 20th visit to Oasis Outback to pick up his rifle, he also had employees install a holographic weapon sight on the rifle. Such a sight allows a user to look through a small glass window and see holographic crosshairs superimposed on a target. Holographic sights are designed for rapid short-range shooting and help users quickly acquire targets, as they do not have to align traditional front and rear iron sights, for example, which requires marksmanship training. Once the crosshairs highlight a target, the user can fire, and

LM LAW GROUP, PLLC
2806 Fredericksburg Rd., Ste. 118
San Antonio, TX 78201
Tel. 210.396.2045

ORIGINAL COMPLAINT FOR DAMAGES

shooters may also keep both eyes open when using a holographic sight to identify more targets in their periphery.

108.    Oasis Outback had a duty not to sell weapons to the just-turned 18-year-old shooter, who it knew or reasonably should have known was likely to harm himself or others.  The shooter was described by patrons of the store as having a nervous disposition and behaving suspiciously. According to the Robb Committee Report, one witness at the store said Ramos "appeared odd and looked like one of those school shooters." He was wearing all black, and a different witness described him as giving off "bad vibes." The owner of Oasis Outback described him as alone and quiet, and questioned Ramos about how he could afford $3,000 worth of rifles. He also knew Ramos was purchasing a massive arsenal of firepower with a suspicious urgency within days of turning 18. But he went ahead anyway and sold and transferred to him the rifles and ammunition.

109.    Oasis Outback knew or should have known that the shooter was not purchasing the assault rifles for recreational purposes. The shooter had purchased two extraordinarily lethal assault weapons and enough ammunition to fight off a small army, as well as a holographic sight and Hellfire Gen 2 trigger system, spending thousands of dollars within days of his 18th birthday.

**E. The Robb Elementary Shooting and Law Enforcement Response.**

110.    Uvalde CISD adopted an active shooter response policy on April 15, 2020, as directed by legislation passed by the Texas legislature in 2019. Every school officer in Texas must be trained on how to respond to an active shooter. The main tenets of active shooter response stem from lessons learned from the Columbine High School mass shooting in 1999. Priority number one is to "stop the killing." Responding officers must have the tools and training to immediately make entry and stop an active shooter. And if they lack one or both, officers were still expected to

LM LAW GROUP, PLLC
2806 Fredericksburg Rd., Ste. 118
San Antonio, TX  78201
Tel. 210.396.2045

ORIGINAL COMPLAINT FOR DAMAGES

stop the shooter. The "Priority of Life Scale" dictates that innocent civilians are prioritized over law enforcement and other responders. According to active shooter training from the ALERRT Center—which the FBI has recognized as the national standard—after Columbine, "[f]rom that moment forward, every law enforcement officer was expected to be willing to risk his or her life without hesitation." Once the shooter has been stopped, the next step is to "stop the dying," that is to render emergency medical aid to victims.

111.    TDPS Director Steven McCraw confirmed this was the standard all the responding officers to Robb Elementary were expected to meet during a press conference three days after the shooting. McCraw said every officer was trained to immediately stop active shooters. "When there is an active shooter, the rules change," he said at the press conference. "Texas embraces active shooter training, active shooter certification, and that doctrine requires officers—we don't care what agency you're from. You don't have to have a leader on the scene. Every officer lines up, stacks up, goes and finds where those rounds are being fired at and keeps shooting until the subject is dead, period."

112.    Four days after picking up the Daniel Defense rifle at Oasis Outback, and after posting on his Instagram a picture of that rifle and the other AR-15 rifle he had purchased, on May 24, 2022, Salvador Ramos fired a gun for the first time in his life in what would turn out to be a sadistic and tragic mass murder of school children and teachers. He began his rampage with an act of domestic violence: he tried to kill his grandmother, shooting and injuring her.

113.    After shooting his grandmother, Ramos drove a few blocks from his home to Robb Elementary School, where he crashed his car in a ditch several hundred feet away from the school

LM LAW GROUP, PLLC
2806 Fredericksburg Rd., Ste. 118
San Antonio, TX  78201
Tel. 210.396.2045

ORIGINAL COMPLAINT FOR DAMAGES

at 11:28 a.m. Two people from a funeral home across the street from the crash site walked toward the truck. Ramos opened fire on them. They ran away and called 911.

114.    Ramos fled the crash scene at 11:29 a.m. wearing dark clothing and carrying a bag. According to witness accounts, after the crash, Ramos tried to exit through the driver-side door but was unable to do so because the door was jammed. Ramos then tossed out two backpacks and exited through the passenger-side door. He picked up only one backpack, leaving the other one behind. He then climbed a five-foot chain-link fence to enter school grounds and walked through the teachers' parking lot on the west side of the building.

115.    Coach Yvette Silva was outside with a group of third graders and witnessed Ramos climbing the fence with a gun. He raised his gun and began to shoot. Silva used her radio to report the shooting and ran towards students to get them to lockdown. She expected to, but did not, hear an immediate call for a lockdown over the school's loudspeaker.

116.    Officers of the Uvalde Police Department, including Defendants Pargas and Coronado, were among the first law enforcement officers to arrive on the scene. Sergeant Eduardo Canales, who was responding to a report of a car crash and shots fired, saw Ramos shooting his gun as he arrived at the school. Sergeant Canales was the commander of the Uvalde PD SWAT team.

117.    Principal Mandy Gutierrez heard Coach Silva's radio report and attempted to initiate a lockdown on the school's Raptor application but could not do so because of a poor Wi-Fi signal. She called Uvalde CISD Police Chief Arredondo, who told her to shut the school down, and she then instructed the janitor to lock all of the doors.

LM LAW GROUP, PLLC
2806 Fredericksburg Rd., Ste. 118
San Antonio, TX  78201
Tel. 210.396.2045

ORIGINAL COMPLAINT FOR DAMAGES

118.     The west building, which housed the fourth graders, began to lock down on an *ad hoc* basis as word spread of the shooting from teachers and students yelling and returning from outside. Teachers instructed students to hide and locked classroom doors.

119.     It was common knowledge that people at Robb Elementary, and other UCISD schools, often left doors unlocked, used rocks to prop open exterior doors, and used door stops, wedges, and magnets to keep exterior and interior doors open. Additionally, Robb Elementary school had a key shortage, and substitute teachers were often advised to circumvent the door lock.

120.     In March 2022, Robb Elementary school administrators received a report that the door to classroom 111 did not lock as it should and could not be locked from inside. Principal Gutierrez testified in front of the Texas House of Representatives Committee investigating the Robb Elementary shooting that school administration knew about the issues with the door to classroom 111.

121.     At 11:31 a.m., a teacher frantically called 911.

122.     By 11:32 a.m., Ramos reached the west teachers' parking lot and fired several shots through a window. These shots can be heard in the background of the teacher's 911 call.

123.     Ramos entered the west building at 11:33 a.m. through an unlocked door. Earlier in the day the door had been propped open by a rock, but that rock was removed, and the door was closed by the time Ramos reached it. He began firing into classrooms from the hallway.

124.     At 11:33 a.m., another 911 call was placed by a man who frantically told the dispatcher, "He's inside the school shooting at the kids!"

125.     Ramos entered unlocked classroom 111—at 11:33 a.m. and began shooting. Classrooms 111 and 112 were adjoining and had a connecting door that allowed Ramos to go

LM LAW GROUP, PLLC
2806 Fredericksburg Rd., Ste. 118
San Antonio, TX  78201
Tel. 210.396.2045
ORIGINAL COMPLAINT FOR DAMAGES

between the classrooms without having to go through the hallway. K.T. and M.Z. were in classroom 112. After entering the classrooms, Ramos dropped to his knees and told the children it was "time to die." Over the next 77 minutes, Salvador Ramos committed a massacre in classrooms 111 and 112.

126.    In testimony to the Texas House of Representatives, Defendant Coronado of the Uvalde PD stated that he and the other initial responders heard shots being fired as the approached the building. Many students in classrooms 111 and 112 would die that day, but many did not die immediately. Instead, they lay in pain, dying slowly.

127.    At 11:34 a.m., only one minute after Ramos entered M.Z.'s, and K.T.'s classroom and while he was shooting children and teachers, Defendant Maldonado parked his TDPS car at Robb Elementary School.

128.    Less than three minutes after the shooting began, officers entered the west building and approached classrooms 111 and 112 from the north side of the building. Defendant Pargas, the acting chief of the Uvalde PD, was right behind the initial group. At the same time, Defendants Coronado and Arredondo approached the classrooms from the south side of the building. At 11:35 a.m., three Uvalde police officers with body armor, two rifles, and three pistols took up positions near classrooms 111 and 112. They had heard the shots being fired in the classrooms. Defendant Arredondo stated the day after the shooting that he heard "plenty" of gunshots as he initially approached and saw gunshots coming out through the walls. According to training and prior policy, officers are required to engage active shooters immediately. They did not do so.

129.    Defendant Pargas, as acting chief of the Uvalde PD, was a policymaker with final policymaking authority. By choosing not to follow the active shooter policy, Defendant Pargas

LM LAW GROUP, PLLC
2806 Fredericksburg Rd., Ste. 118
San Antonio, TX  78201
Tel. 210.396.2045

ORIGINAL COMPLAINT FOR DAMAGES

created a new policy. This policy was to barricade children, including M.Z. and K.T., inside a classroom with an active shooter, delaying emergency medical and rescue services and depriving them of the comfort of their family.

130.     As Defendant Daniel Coronado approached the building at 11:35 a.m., he yelled "oh shit, shots fired, get inside," according to the recording from his body camera.

131.     Once officers on site realized that Ramos was armed with an AR-15 rifle, many became alarmed and backed away from classrooms 111 and 112. They requested additional equipment, instead of doing what was required under the active shooter policy, to breach the classroom immediately and to stop the killing. This delay was particularly unreasonable given the prevalence of AR-15 rifles in Texas and the fact that some officers themselves were armed with rifles. The officers violated active shooter protocols and began implementing the new policy of barricading Ramos in the classroom with the students.

132.     At 11:36 a.m., four additional officers arrived inside the building, including the Uvalde SWAT team commander, Sgt. Canales, and Defendant Arredondo. Arredondo, who had co-authored UCISD's active shooter plan, was required by policy to set up a command post and serve as the on-site commander. He did not do so. A minute after their arrival, Ramos resumed shooting inside Classrooms 111 and 112 and continued intermittently firing his gun for several minutes.

133.     Like Defendant Pargas, Defendant Arredondo was a policymaker with final policymaking authority. By choosing not to follow the active shooter policy, Defendant Arredondo created a new policy. Defendant Arredondo explained in an interview shortly after the shooting that he "had him [Ramos] contained" and "kn[e]w there's probably victims in there" with the

LM LAW GROUP, PLLC
2806 Fredericksburg Rd., Ste. 118
San Antonio, TX  78201
Tel. 210.396.2045

ORIGINAL COMPLAINT FOR DAMAGES

shooter. Defendant Arredondo created a policy to barricade children, including M.Z. and K.T., inside a classroom with an active shooter, delaying rescue and emergency medical services and depriving them of the comfort of their family. He intentionally trapped children in the room with the shooter.

134.    There was no central command post set up outside of the building, causing a dangerous lack of coordination and an ineffective response. No one was evaluating the information as it came in and ensuring that there were adequate supplies and equipment. Each of these failures worsened the situation. And each of these was directly in contravention of the principles of active shooter response, principles in which every Law Enforcement Individual Defendant should have been properly and adequately trained.

135.    The gunman continued actively firing his weapon until 11:36 a.m. At this time, the Law Enforcement Individual Defendants were aware that the gunman was barricaded in the classroom with victims that were dead or dying. Indeed, Monica Martinez, a STEM teacher hiding in a closet, called 911 at 11:36 a.m. to report somebody banging at the school and said in a muffled voice "I'm so scared." But the other law enforcement officers on site took no steps to rescue the children and teachers slowly dying inside classrooms 111 and 112.

136.    At 11:37 a.m., four minutes after Ramos entered classrooms 111 and 112, a group of Uvalde PD Officers approached and prepared to breach the classrooms but retreated after Ramos fired and Sgt. Canales and another officer were grazed with shrapnel.

137.    As the officers were retreating, UCISD-PD Officer Ruben Ruiz said, "that's my wife's classroom," referring to the room the shots were coming from. Officer Ruiz's wife, Eva

LM LAW GROUP, PLLC
2806 Fredericksburg Rd., Ste. 118
San Antonio, TX  78201
Tel. 210.396.2045

ORIGINAL COMPLAINT FOR DAMAGES

Mireles, was a fourth-grade teacher in classroom 112. Several officers were within earshot of Officer Ruiz when he made this statement.

138.    At 11:37 a.m., Defendant Maldonado from the Texas Department of Public Safety approached the school building. As he approached, Sgt. Canales of the UPD was exiting after being hit with the building fragments. Defendant Maldonado asked Sgt. Canales, "is he in there?" Defendant Sgt. Canales responded, "he is in the class."   Sgt. Canales also told Defendant Maldonado, "Shots fired, we got to get in there."

139.    Defendant Maldonado did not respond to this information by running toward the gunfire, as active shooter protocol dictates. Instead, he stood outside the building and said, "D.P.S. is sending people."

140.    While other officers approached the classrooms at 11:37, Defendant Pargas of the Uvalde PD can be seen on body camera footage standing back from the classroom, disengaged from the situation.

141.    A minute later, at 11:38 a.m., the first agents from the U.S. Border Patrol arrived on scene.

142.    At 11:38 a.m., Defendant Coronado told other officers that the suspect was "contained" and "barricaded." A "contained subject" is a term of art used for a *non*-active shooter situation. This was factually incorrect since the shooter was actively firing his gun even as Coronado relayed this information. On information and belief, the Law Enforcement Individual Defendants knew that there were dying children in the classroom with him who needed, but could not access, medical treatment. And as periodic gunfire continued, each Law Enforcement Individual Defendant knew that this was an active shooter situation and NOT a barricaded subject

situation. Defendant Coronado in particular had heard gunfire as he approached the school and had been standing in the hallway when Ramos shot at the officers. It was during this retreat that he exited the building through the south door and erroneously announced on his radio that the shooter was "contained." Around this time, Defendant Coronado used his radio to request ballistic shields and helicopter support.

143.    Defendant Coronado subsequently told the Texas House Committee that he thought the suspect had probably fled to the school during an immigration "bailout"—a term used in border communities for car chases involving human smugglers, which sometimes end in crashes and shootouts. In the three months before the shooting, there had been nearly 50 school lockdown and security alerts related to bailouts.

144.    No officer attempted to enter the classrooms where Ramos was located. They did the opposite: the Law Enforcement Individual Defendants treated Ramos as a "barricaded subject," and furthered that by setting up two "fronts" of law enforcement officers on either side of the doors to rooms 111 and 112. The Law Enforcement Individual Defendants sought out a bullhorn and made no effort to disguise their presence. And they did not enter the classroom and shoot Ramos, as they knew (or should have known) was the only proper response in a situation with an active shooter.

145.    The effect was to trap the injured and dying and prolong the time Ramos had to shoot additional children and adults, including M.Z. and K.T., inside classrooms 111 and 112 with Ramos.

146.    During those seventy-seven minutes, M.Z. and K.T. were deprived of access to rescue (by law enforcement, other emergency personnel, or private citizens), emergency medical

LM LAW GROUP, PLLC
2806 Fredericksburg Rd., Ste. 118
San Antonio, TX  78201
Tel. 210.396.2045
ORIGINAL COMPLAINT FOR DAMAGES

services, and the comfort of their families—who were just outside the law enforcement perimeter—as they lay suffering.

147.     M.Z. was deprived of access to rescue (by law enforcement, other emergency personnel, or private citizens), emergency medical services, and the comfort of her family as she lay with multiple gunshot wounds, including a gunshot to the chest. M.Z. heard the voices of law enforcement officers in the hallway outside classroom 112 and told a friend who had been shot and later succumbed to her wounds that they would soon be rescued because the police had arrived.

148.     K.T. was deprived of access to rescue (by law enforcement, other emergency personnel, or private citizens), emergency medical services, and the comfort of her family as she lay wounded and covered in the blood and brain tissue of her friends. She spent seventy-seven minutes laying with her eyes open, so that she would appear to be dead. What she witnessed during those seventy-seven minutes was torturous to her.

149.     One survivor from one of the classrooms recalled that after the police arrived at Robb, they instructed from the hallway that children who needed help should yell for help. One child in the room did so. Ramos came into that classroom and shot that child.

150.     By 11:38, Defendant Nolasco had responded to Ramos's grandmother's house, and was speaking to her. She told him that her grandson had shot her and told Defendant Nolasco his name. Defendant Nolasco did not share this information with other law enforcement officers responding to the shooting at Robb, even as they asked for that information.

151.     At 11:40 a.m., Defendant Arredondo called police dispatch and sought additional officers to participate in the barricade. He said "he's [Ramos] in one room. I need a lot of fire power, so I need this building surrounded. I need it surrounded by as many AR-15s as possible."

LM LAW GROUP, PLLC
2806 Fredericksburg Rd., Ste. 118
San Antonio, TX  78201
Tel. 210.396.2045

He did not request or set up for a breach of the classroom; rather, he requested additional officers to fortify the barricade.

152.    Around 11:41 a.m., more officers arrived, including officers from TDPS. Three of the officers on scene, Defendants Field, Zamora, and Zamora were instructors at the regional police academy.

153.    At 11:43 a.m., Chief Arredondo called the Uvalde police asking for a radio, rifle, and additional ammunition. He gave orders to officers to stand down while the shooter was actively shooting teachers and students trapped in classrooms 111 and 112.

154.    At 11:43 a.m., someone over the radio announced that classrooms 111 and 112 "should be in session," which could be heard in Defendant Coronado's body camera footage. Instead of following active shooter protocol and entering the building based on this information, Coronado remained outside the building for 30 more minutes, warning entering officers about a "fatal funnel" if they lined up incorrectly in the hallway. A "fatal funnel" is a law enforcement term for a doorway where one can be easily seen but have difficulty moving out of in the case of incoming projectiles. Had the law enforcement officers followed active shooter protocol and immediately entered the room with the shooter, this concern would have not existed. Instead, Defendant Coronado's warning provided an excuse for delay and is an example of responding officers considering their own safety ahead of the children and teachers they had barricaded inside the classrooms with Ramos.

155.    At 11:44 a.m., Ramos started shooting again. No officer responded, including the police academy instructors, Defendants Field, Zamora, Suarez, and Mendoza. Though it was or should already have been evident to the Law Enforcement Individual Defendants that this was an

LM LAW GROUP, PLLC
2806 Fredericksburg Rd., Ste. 118
San Antonio, TX  78201
Tel. 210.396.2045

ORIGINAL COMPLAINT FOR DAMAGES

active shooter situation, the renewed gunfire at 11:44 a.m. was further proof that treating Ramos as a "barricaded subject," and trapping him inside a classroom with dozens of victims, made the situation much more dangerous than it had been before law enforcement arrived. The students, including M.Z. and K.T., could hear the officers in the hallway. Upon information and belief, there were 18 law enforcement officers in the school building by this time. By virtue of this show of authority and barricading everyone inside, no reasonable person would have felt free to leave the classroom.

156.    Defendant Mendoza's body camera footage shows that he was standing or pacing in the hallway, barricading students inside by virtue of his show of authority, from 11:43 a.m.-12:02 p.m.; 12:08-12:16; and from 12:20 until at least 12:33. Gunshots can audibly be heard on his body camera footage at approximately 12:20, but Defendant Mendoza continues to maintain the barricade, slowly moving toward the door. He then resumed pacing in the hallway. Officers would not breach the classroom for another 30 minutes.

157.    Concerned family members of students began amassing near the school around the funeral home. Defendant Coronado directed officers to perform crowd control.

158.    At 11:47 a.m., the officers began searching for a negotiator and a bullhorn to negotiate with the shooter. This would have been an appropriate response for a barricaded subject, but it went counter to all training on how to respond to an active shooter. Defendant Arredondo also intermittently attempted to make verbal contact with Ramos.

159.    Law enforcement continued to arrive at the school in large numbers. These officers continued their fortification of the barricade rather than attempting to engage the shooter.

ORIGINAL COMPLAINT FOR DAMAGES

160.    At 11:48 a.m., Officer Ruiz told other officers in the hallway that his wife, Eva Mireles, had called him from inside room 112 and told him she had been shot and was dying. Officers escorted him outside and took away his gun for safety. No officer attempted to enter room 112 and confront Ramos. Ms. Mireles later died in an ambulance.

161.    At 11:49 a.m., Robb Elementary parents received an email from the school informing them that "Robb Elementary is under a Lockdown Status due to gun shots in the area. The students and staff are safe in the building. The building is secure in a Lockdown Status. Your cooperation is needed at this time by not visiting the campus." No one trapped in the school was free to leave and the school intentionally diverted away means of rescue other than the officers barricading the shooter in with the children.

162.    Defendant Betancourt was 70 miles away from Uvalde when the shooting began. While driving to Robb Elementary, Betancourt called the mayor of the City of Uvalde and the Chief of the Uvalde Police Department, and he then instructed TDPS officers on the scene that they should remain outside Robb Elementary and establish a perimeter.

163.    This further ensured that M.Z., K.T., and the other victims would remain trapped inside classrooms 111 and 112 with their murderer, unable to access rescue, emergency medical services, and the comfort of their loved ones.

164.    By 11:49, Defendant Nolasco had arrived at Robb. He had been in regular text contact with Defendant Betancourt. Around this time, Nolasco texted Betancourt, "Barricaded at the school," although he had access to information that should have indicated to him that Ramos was not "barricaded."

LM LAW GROUP, PLLC
2806 Fredericksburg Rd., Ste. 118
San Antonio, TX  78201
Tel. 210.396.2045

ORIGINAL COMPLAINT FOR DAMAGES

165.     Also around this time, Defendant Nolasco told his deputies, "DPS is coming. I got the captain. We need to, we need to get this contained and see who's in charge." Likewise, it should have been apparent to Nolasco that "containment" was an inappropriate response to an active shooter.

166.     Defendant Nolasco had not completed a state active shooter training, and his office did not have an active shooter policy in place on May 24, 2022.

167.     By 11:51 a.m., officers from at least seven different agencies were on site. Officers had rifles and body armor. No officer attempted to enter the classroom at this time. In total, 376 law enforcement officers from 23 law enforcement agencies would arrive on scene that day. Upon information and belief, by 12:00 p.m.—27 minutes after the shooter entered the school—there were 28 law enforcement officers in the building.

168.     At 12:09 p.m. Defendant Arredondo instructed officers not to perform a breach of the classroom. He told officers that "time is on our side right now," despite the fact that "we probably have kids in there [Classrooms 111 and 112]." Time was not on the trapped children's side. They were dying in the classrooms that officers had surrounded.

169.     A minute later, at 12:10 p.m, as desperation grew in the classroom, K.T. found her teacher's phone. She wiped the blood off of the screen and called 911. She told the 911 dispatcher that there were a lot of bodies in her classroom and that her teacher, Ms. Mireles, was alive but had been shot. K.T. asked for an ambulance. Ms. Mireles continued to suffer, even though she had called her husband, Officer Ruiz, before 11:48 a.m. The law enforcement delay proved fatal for her. K.T. begged the dispatcher for help, and she stayed on the phone with the 911 dispatcher for 17 minutes, risking her life if the shooter had realized that she was making that call. At one point,

LM LAW GROUP, PLLC
2806 Fredericksburg Rd., Ste. 118
San Antonio, TX 78201
Tel. 210.396.2045

ORIGINAL COMPLAINT FOR DAMAGES

the dispatcher asked her how many people were alive in the classroom with her. K.T. can be heard counting: "One, two, three, four, five, six, six people. Seven, eight." She hung up when she feared that the shooter, who was taunting the children, was about to discover her.

170.   At 12:12 p.m., the Law Enforcement Individual Defendants received a radio dispatch that one of the classrooms was "full of victims." This information was communicated directly to Defendants Pargas and Nolasco, among others. Defendant Pargas stepped out of the school building to contact the dispatcher for more information about the K.T.'s 911 call. He was even given her name. This confirmation of what should have already been obvious did not change the response of the Law Enforcement Individual Defendants. They did not make any attempt to "stop the killing," the primary tenet of all active shooter training and responses. Instead, they ignored this information and continued to treat Ramos as a "barricaded subject."

171.   By 12:13 p.m., the U.S. Border Patrol Tactical Unit ("BORTAC") commander, Paul Guerrero, arrived on scene. He informed other officers that it was "going to take time" to breach the door. He was then told by other officers that there were students in the classroom with the gunman. His response was to leave the building to retrieve a breaching tool from his car.

172.   A student in classroom 111 called 911 at 12:16 p.m., and stayed on the phone for a minute and 17 seconds.  Also at 12:16 p.m., Defendant Pargas called his UPD dispatchers to get further details about the radio message concerning a classroom "full of victims" that he received four minutes earlier. He was told by dispatch that the call came from a student (who we now know to have been Plaintiff K.T.) and that eight or nine were still alive in the room, but the student couldn't be sure of the exact number because it was hard to tell who was injured versus who was already dead. Defendant acting Chief Pargas said, "Ok, ok, thanks," and ended the call with

LM LAW GROUP, PLLC
2806 Fredericksburg Rd., Ste. 118
San Antonio, TX  78201
Tel. 210.396.2045
ORIGINAL COMPLAINT FOR DAMAGES

dispatch. He entered the school briefly at 12:17 p.m., mentioned victims to a Border Patrol officer, and walked back out of the school at 12:20. He spent the next 30 minutes outside and never attempted to breach the classroom as the active shooter protocol required.

173.    Around 12:19 p.m., Defendant Zamora suggested, without evidence, that perhaps Ramos had shot himself. He was wrong. He also continued to stand in the hallway, barricading the students and teachers inside the classrooms.

174.    At 12:20 p.m., Defendant Arredondo told another officer, "We have victims in there. I don't want to have any more. You know what I'm saying?" He continued to make no attempt to immediately enter the classrooms instead opting to continue his policy of treating Ramos as a barricaded subject. Indeed, when at one point it appeared a group of officers were preparing for a breach Defendant Arredondo said, "tell them to f*****g wait." Defendant Arredondo's flagrant disregard for the lives of the children in the classroom was apparent, as he even stated in an interview that "the thought crossed my mind to start shooting through that wall" into the classrooms with Ramos.

175.    At 12:21 p.m., after a 37-minute break in shooting, Ramos began firing again from inside the classroom. A team of law enforcement officers with rifles and tactical gear approached the classroom but made no attempt to enter the classroom. Among those that did not attempt to approach the classroom in response to the shots fired was Defendant Kindell. He continued to confer with Border Patrol agents instead of rushing the classroom as active shooter protocol requires. This conference clogged the hallway and contributed to barricading the students and teachers in the classrooms with the shooter.

176.    Detective Kindell was later fired by TPDS. Upon information and belief, TDPS director Stephen McCraw wrote to Kindell in a letter that, "[y]ou should have recognized the incident was and remained an active shooter situation which demanded an active shooter response rather than a barricaded subject situation." Upon information and belief, his firing was justified under chapters of the TDPS manual that require officers to "maintain sufficient competency to properly perform their duties and assume the responsibilities of their positions," and directs officers to take action "for the detection, prevention and prosecution of violators of any criminal law … not part of their regular police duties" if "the exigencies of the situation require immediate police action."

177.    At 12:30 p.m., Defendant Betancourt arrived (he later told investigators he had not arrived until 12:45 p.m., which was false). Defendant Betancourt instructed state police officers on site to remain outside and establish a perimeter, rather than rush inside, as active shooter protocol would have dictated.

178.    At 12:34 p.m., Defendants Coronado and Arredondo conferred and agreed that there were people in the room with Ramos and casualties as well.

179.    At 12:36 p.m., K.T. called 911 again. She told the dispatcher, "There's a school shooting." She was told to stay on the line and keep quiet. Because she could hear the police outside her classroom door, K.T. asked the dispatcher, "Can you tell the police to come to my room?" K.T. told the 911 dispatcher that she could open the door to her classroom so that the police gathered outside could enter. The dispatcher told her not to do that. K.T. complied with the 911 dispatcher's order and did not open the classroom door.

LM LAW GROUP, PLLC
2806 Fredericksburg Rd., Ste. 118
San Antonio, TX  78201
Tel. 210.396.2045
ORIGINAL COMPLAINT FOR DAMAGES

180.    M.Z. also heard the law enforcement officers gathered outside the door to classroom 112. Her friend lay next to her, dying, and M.Z. told her, "don't worry. They're coming to save us." M.Z. had to wait many more minutes for rescue, and during that time she watched her friend die.

181.    As these events were unfolding in the building, parents and family members of the students gathered in large numbers outside of the school. Parents yelled at officers to go in. Many family members, hearing gunfire and seeing no discernable police response, wanted to go into the classroom themselves.  Defendant Nolasco kept parents from entering the school, even as parents yelled at him to do something, anything, to rescue their children.

182.    Officers, including Defendants Dorflinger and Suarez, began yelling at, shoving, restraining, and tackling people outside. A fence was destroyed as police threw a man into it. Other parents were tased, handcuffed, and pepper sprayed outside the building, all while the police failed to engage the shooter.

183.    During this time, Plaintiff Ruben Zamora was outside Robb Elementary. Plaintiff Ruben Zamora had asked his father-in-law to bring a rifle to the school, with the hope that he could help rescue his daughter and the other children in classrooms 111 and 112. He was prevented from mounting a rescue operation by the law enforcement defendants, and in particular the law enforcement perimeter that Defendant Betancourt had ordered into place.

184.    The law enforcement delays were so lengthy that the local Wal-Mart store learned that there was an active shooter at Robb and had time to deliver a pallet of water bottles to be handed out to first responders. Plaintiff Ruben Zamora, kept away from engaging in rescue

LM LAW GROUP, PLLC
2806 Fredericksburg Rd., Ste. 118
San Antonio, TX  78201
Tel. 210.396.2045
ORIGINAL COMPLAINT FOR DAMAGES

operations, had to resort to handing out water to the first responders who were doing nothing to rescue his daughter, M.Z., and the other children in classrooms 111 and 112.

185.    Inside classrooms 111 and 112, children and teachers lay dying. Some lay in their own blood, some in the blood of their friends. One child waited so long in his hiding spot under a table that he began to fall asleep. For 77 minutes, the Law Enforcement Individual Defendants were present and armed but inexplicably failed to breach the classroom and stop the killing. Their delays lengthened the time that Plaintiffs Christina Zamora, Ruben Zamora, and Jamie Torres suffered emotional distress, waiting for news of what happened to their beloved children. And their delays lengthened the time that the children and teachers in classrooms 111 and 112, including M.Z. and K.T., were exposed to Ramos's murderous rampage and lay suffering.

186.    While standing outside, doing nothing, before the breach, Defendant Maldonado told another officer, "This is so sad, dude. He shot kids, bro."

187.    By 12:48 p.m., a BORTAC-led group of officers was finally preparing to breach the door. However, Defendant Betancourt came over the radio with a message: "Hey, this is D.P.S. Captain Betancourt. The team that's going to make breach, I need you to stand by." Thankfully, his message was ignored.

188.    Finally, around 12:50 p.m.—77 agonizing minutes after police first arrived, and 37 minutes after BORTAC arrived—a BORTAC-led tactical team breached the door and shot Ramos, killing him. At least one of the deceased students still had a pulse after the classroom was breached.

189.    Even after the BORTAC team killed Salvador Ramos, the Law Enforcement Defendants continued to fail to follow their active shooting training, because they did not "stop the dying." During the 77 minutes preceding the killing of Ramos, there was no systematic attempt

LM LAW GROUP, PLLC
2806 Fredericksburg Rd., Ste. 118
San Antonio, TX  78201
Tel. 210.396.2045

ORIGINAL COMPLAINT FOR DAMAGES

to plan for the many casualties who would need emergency medical treatment and transport. Because of the barricade, ambulances were unable to park directly next to the entrance to the school since law enforcement vehicles blocked their way. And helicopters that offered to land at the school with supplies of blood and the ability to transport victims to Level I trauma facilities were turned away. There were so few available ambulances that injured children were transported to the hospital in a school bus with no medical professionals on board.

190.     Plaintiff M.Z. experienced pain and suffering when she was removed from the classroom. She could not be placed directly in an ambulance, and instead was initially transported in the bed of a Border Patrol pickup truck. M.Z. experienced pain and suffering because she was not immediately placed on a helicopter to be flown to a Level I trauma facility, and instead was taken to a local hospital that was ill equipped to treat her catastrophic injuries. She recalls an EMT continuously saying "stay with me" as she was transported back and forth. Upon information and belief, this was because the Law Enforcement Defendants turned away helicopters that offered to land at Robb Elementary.

191.     Plaintiff K.T. was carried out of the classroom by an employee of the U.S. Department of Homeland Security. She was in shock and was so traumatized that she did not know her own name. The DHS employee handed K.T. to a first responder who placed K.T. onto a school bus with other injured children. The school bus took them to the hospital, but there were no medical professionals on the bus.

**F.  The Law Enforcement Defendants' Actions Were a Proximate Cause of Harm to the Plaintiffs.**

192.     Throughout this period, officers employed by the Law Enforcement Municipal Defendants failed to follow active shooter protocols.

193.    Reports have indicated that, as of May 24, 2022, approximately half of the Uvalde Police Department Officers had not received active shooter training. And of the Uvalde County Sheriff's Office employees, only 20% had active shooter training.

194.    The Law Enforcement Individual Defendants acted in reckless disregard of Plaintiffs' clearly established constitutional rights in treating the situation as a "barricaded subject" situation when all indications were that the situation involved an active shooter.  Their actions were reckless, unconscionable, unreasonable, and contrary to clearly established protocols for responding to an active shooter.

195.    Thus, they did not follow the first principle of active shooter response: immediately distract, isolate, and neutralize the active shooter. They did not do what they should have been trained to do: stop the killing.

196.    The Law Enforcement Municipal Defendants failed to train and supervise their employees, resulting in a law enforcement response to the shooting at Robb Elementary that worsened the danger and resulted in children being trapped in two classrooms with their murderer for 77 minutes as he continued killing and as M.Z., K.T., and their classmates lay dying and suffering.

197.    In the alternative, the final policymaking decisionmakers, Defendants Pargas, Arredondo, and Nolasco, overrode active shooter protocol and made a new policy to treat Ramos as a barricaded subject, contrary to the clear facts in front of them as well as the existing active shooter policy. Arredondo stated the day after the shooting that he was "certain" he heard the shooter reload one time—which should have signaled to him that 1) the threat was not over and 2) he had an opportunity to breach and engage.

LM LAW GROUP, PLLC
2806 Fredericksburg Rd., Ste. 118
San Antonio, TX  78201
Tel. 210.396.2045
ORIGINAL COMPLAINT FOR DAMAGES

198.    The Law Enforcement Municipal Defendants' failures also caused harm to the Plaintiffs because, even after the BORTAC team "stopped the killing," the Law Enforcement Municipal Defendants, through their officers, failed to "stop the dying," another requirement of all active shooter responses. As detailed above, not only did they fail to render lifesaving medical treatment, but many officers' actions also made it much more difficult for emergency medical responders to triage, treat, and transport the injured and dying children and teachers.

**G.  The Impact of the Shooting on the Plaintiffs.**

***K.T.***

199.    While the massacre unfolded on May 24, 2022, K.T. lay for over an hour with her eyes open, pretending to be dead. She lay with her eyes open because she saw that her classmates who were dead had their eyes open, and she wanted to do everything that she could to not rouse the suspicions of the shooter as he moved back and forth between classrooms 111 and 112. Because she couldn't close her eyes, K.T. saw her classmates and friends dying. K.T. had only recently transferred to Robb Elementary, but in that time she had become close to another student. When she realized that her friend had been shot and was not moving, she crawled over to her and hugged her, before returning to where she was pretending to be dead.

200.    K.T. also witnessed Salvador Ramos taunting her classmates who still lived. He sat at the teacher's desk, playing scary music on his phone. At one point, he was in classroom 111 and called out, pretending to be the police, asking if anyone in classroom 112 needed help. K.T. tried to convince the girl next to her not to call out for help, but that child did, and Ramos came into the classroom and killed her.

LM LAW GROUP, PLLC
2806 Fredericksburg Rd., Ste. 118
San Antonio, TX  78201
Tel. 210.396.2045

ORIGINAL COMPLAINT FOR DAMAGES

201.    K.T. had shrapnel injuries, but when she arrived at the hospital, she was covered in her classmates' blood and brain tissue. She has been diagnosed with post-traumatic stress disorder (PTSD) and is in counseling. She also has a service dog who helps her with her PTSD. Despite these services, K.T. is anxious and fearful. In new places, she needs to sit near an exit, so that she can escape if she needs to; she also looks for hiding places in any room. She has told her mother that walls don't protect you from bullets, because Ramos was able to shoot through walls.

202.    K.T. often has trouble sleeping, wanting to stay awake so she can keep watch. She has not returned to school, and is instead doing remote learning, but she struggles to concentrate and sometimes refuses to do schoolwork. She is often angry at the world for what she went through and tells her mother that she will never trust the police to respond to an emergency. Sometimes K.T. talks to survivors of other school shootings, and that helps her on her worst days.

### Jamie Torres

203.    On the day of the shooting, Jamie Torres was in Oklahoma, attending to family business. Jamie and her family had recently relocated from Stillwater, Oklahoma, to Uvalde. When she heard that something had happened at Robb, she immediately started the long drive to Uvalde. She was panicking and took several wrong turns, and the trip back to Uvalde took many hours.

204.    Jamie's sister-in-law was at the hospital and found K.T. She called Ruben, K.T.'s dad, who called Jamie as she was driving back to Uvalde. Ruben told her that K.T. was covered in blood but did not have life-threatening physical injuries. It wasn't until late that night that Jamie was finally reunited with her daughter. The wait was excruciating.

205.    Jamie Torres had to quit her job after the shooting. Caring for K.T. has become a full-time job, especially on days when K.T. has not been able to sleep. Jamie regrets that she moved

LM LAW GROUP, PLLC
2806 Fredericksburg Rd., Ste. 118
San Antonio, TX  78201
Tel. 210.396.2045

ORIGINAL COMPLAINT FOR DAMAGES

to Uvalde and placed her daughter at Robb. She often thinks about how different things would be if they had stayed in Oklahoma or if they had moved to San Antonio instead of Uvalde. She blames herself that K.T. was at Robb the day of the shooting.

206.    Jamie knows that her daughter will recover, slowly, from the traumas she has endured, and she is extraordinarily proud that her daughter showed bravery and courage on the day of the shooting, even as the hundreds of law enforcement officers who responded to the shooting did nothing to rescue K.T. and the other children in classrooms 111 and 112.

### *M.Z.*

207.    M.Z. was evacuated from classroom 112 in the back of a Border Patrol pickup truck. From there, she was placed in an ambulance. The EMTs in the ambulance had wanted M.Z. to be airlifted to a Level I trauma facility in San Antonio, but there were no helicopters standing by, so they drove her to Uvalde Memorial Hospital, a Level IV trauma facility, which is the lowest trauma level rating. Several hours later, M.Z. was airlifted to University Hospital in San Antonio. Upon information and belief, that delay extended the time before she could receive the lifesaving care she ultimately received in San Antonio.

208.    M.Z. spent the next several days in a medication-induced coma and the next several weeks in an intensive care unit. Over two months passed before she could safely be discharged from the hospital. She has undergone over sixty surgeries, and many painful medical procedures. She needs more surgeries and ongoing rehabilitative care. M.Z. has a long road ahead to her physical recovery.

209.    M.Z. struggles emotionally. She has been diagnosed with PTSD. Loud noises terrify her, and she has nightmares. Her family has a sign asking visitors not to knock or ring the

LM LAW GROUP, PLLC
2806 Fredericksburg Rd., Ste. 118
San Antonio, TX  78201
Tel. 210.396.2045
ORIGINAL COMPLAINT FOR DAMAGES

doorbell, but some visitors still knock. When they do, M.Z. has to run and hide. She is frightened to sleep alone many nights, so she sleeps in her older brother's room or he sleeps in hers.

### Christina and Ruben Zamora

210.     On May 24 around noon, Christina saw a Facebook post that there were shots fired at Robb. The post was made by someone who was a janitor for UCISD and the dad of one of her daughter's friends. She and Ruben had been at the school earlier in the day for the awards ceremony.

211.     Christina assumed it was a "bailout" that caused the report of shots fired, but she wanted to go to school anyway. Christina's cousin, who worked with her, offered to drive Christina to Robb Elementary, and when they arrived, they found many cars and nowhere to park—they had to park far down the street and approach the school on foot. They were never able to actually go into the school and instead were turned away by a police officer outside of the school grounds and told to go to the Civic Center where students were being bussed. Christina still had no idea that there was an active shooter at the school, only that there were reports of "shots fired."

212.     Ruben was able to get to Robb because he arrived at a different side of the school. He handed out bottles of water to first responders, but he grew increasingly worried and concerned as there was no progress.

213.     At the Civic Center, there were no official updates, only rumors. Parents were frantic and scared. Emergency vehicles were passing by. Christina kept thinking and hoping that this was just a bailout.

LM LAW GROUP, PLLC
2806 Fredericksburg Rd., Ste. 118
San Antonio, TX  78201
Tel. 210.396.2045
ORIGINAL COMPLAINT FOR DAMAGES

214.    At the Civic Center, Christina called a relative who worked at the hospital. She asked the relative to check for M.Z. There was someone who had been admitted who had a similar name to M.Z. The relative told Christina to come to the hospital.

215.    At the hospital, Christina was taken upstairs. They told her M.Z. was not there, though Christina later learned that this was wrong. So, Christina left the hospital and went back to the Civic Center. She called Ruben and told him to go there as well.

216.    Christina returned to the Civic Center, and her 24-year-old son met her there. It was then that she learned from Irma Garcia's sister that her sister, a teacher at Robb Elementary in rooms 111 and 112, had been shot by a gunman who entered that room. Ms. Garcia's sister shared that she heard that her sister Irma was shot and injured, and that students in that classroom were also shot and injured. Christina would later learn that Irma Garcia died from her gunshot wounds.

217.    Terrified after learning that an active shooter was in her daughter's classroom, Christina received a call from the Uvalde Hospital. M.Z. was being airlifted, in critical condition. Christina and Ruben rushed back to the Uvalde Hospital, hoping to catch the helicopter before it took off because they did not want M.Z. to feel alone and scared. The helicopter had already taken off by the time they reached the hospital, so Christina and Ruben immediately drove to San Antonio, and they saw M.Z. for the first time at 6 p.m. in San Antonio.

218.    During all this time, M.Z.'s older brother, Z.Z., was on lockdown at his middle school. He wasn't released until 5 p.m.

219.    Christina and Ruben spent the next two months living in M.Z.'s hospital room in San Antonio. Their older children lived at a Ronald McDonald House that was adjacent to the hospital.

LM LAW GROUP, PLLC
2806 Fredericksburg Rd., Ste. 118
San Antonio, TX  78201
Tel. 210.396.2045

ORIGINAL COMPLAINT FOR DAMAGES

220.    The family had to relocate to San Antonio from Uvalde, because M.Z. requires daily physical therapy, occupational therapy, and counseling. Z.Z. misses his friends and his routine in Uvalde, but they cannot return until M.Z. no longer requires daily visits to doctors, rehabilitation specialists, and therapists.

221.    When they left the hospital, Christina experienced serious anxiety. She felt that, since her worst fears had happened to her family, the world no longer could ever feel safe to her.

222.    Christina had to leave her job. She spends her days caring for M.Z. and Z.Z. and taking M.Z. to medical and behavioral health appointments.

223.    Ruben took four months off from work. At work, he is more on edge now, because the shooting made him realize that you can never know what will happen. His work has an element of danger, and after the shooting, he is sometimes scared and has to get help for tasks he could do alone previously. Ruben had to turn down a promotion at work because he couldn't handle any more stress. He is worried about all the days off he needs to take.

## V.
## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
Negligence
(By Plaintiffs Christina and Ruben Zamora, individually and as next friends of M.Z.; and Jamie Torres, individually and as next friend of K.T.; Against Defendant Daniel Defense)

224.    Plaintiffs incorporate and re-allege the above paragraphs as if stated fully here.

225.    Defendant Daniel Defense was subject to the general duty imposed on all persons not to expose others to reasonably foreseeable risks of injury.

226.    Defendant Daniel Defense had a duty to exercise reasonable care in selling, offering for sale, marketing, and shipping its firearms, including AR-15 rifles, and to refrain from engaging in any activity creating reasonably foreseeable risks of injury to others.

227.    Defendant Daniel Defense's marketing of its AR-15-style rifles breached its duty to exercise reasonable care. The company's marketing encouraged the illegal and dangerous misuse of its AR-15-style rifles by marketing them to the civilian purchasers, including via social media, with violent and militaristic imagery, unfairly and illegally implying that civilians can use their weapons for offensive combat-like missions, and, in particular, by appealing to the thrill-seeking and impulsive tendencies of susceptible teens and young men who are attracted to violence and military fantasies. Aside from the notoriety gained through product insertion of the DDM4 V7 assault rifle into a popular video game such as *Call of Duty*, much of Daniel Defense's illegal marketing strategy is profit-driven. Both Daniel Defense and *Call of Duty* have profited significantly from this unofficial collaboration.

228.    On or about May 16, 2022, Defendant Daniel Defense sold the rifle to Ramos that was later used in the Uvalde school mass shooting.

229.    Ramos' purchase and illegal use of the Daniel Defense DDM4 V7 was a direct result and foreseeable consequence of the way the company marketed its AR-15-style rifles.

230.    Each of the above acts or omissions by Defendant Daniel Defense constitutes negligence, and that negligence was a proximate cause of the injuries to the other Plaintiffs.

231.    Defendant Daniel Defense also violated the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45(a), by knowingly engaging in unfair trade practices. This claim is thus

exempted from immunity conferred by the Protection of Lawful Commerce in Arms Act, 15 U.S.C. § 7902.

232. Daniel Defense's marketing practices were unfair because they encourage purchasers to illegally misuse their AR-15-style rifles and because of the other ways in which it marketed these rifles, all as described in this complaint. This foreseeably caused or was likely to cause substantial injury to consumers and foreseeable victims of gun violence by increasing the risk that disaffected purchasers predisposed towards committing acts of mass violence will carry out those acts, and by encouraging them to choose especially lethal weapons to do so, such as the Daniel Defense DDM4 V7 rifle.

233. Plaintiffs are consumers who could not reasonably avoid the injuries caused by these marketing practices. They purchase school supplies, clothing, sneakers, and backpacks, among other things, as part of the educational process, but they could not reasonably avoid the harms caused by Daniel Defense's marketing. For instance, K.T.'s father had trained her in how to respond in the event of a mass shooting at her school, but she still suffered grave harms. Both M.Z. and K.T. (and their families) had no way to avoid the risk that someone would do to them exactly what Daniel Defense's marketing encouraged: carry out a combat operation against civilians.

234. Plaintiffs are also consumers of health care services—including medical and mental health care services. As a proximate result of Daniel Defense's actions, Plaintiffs have suffered significant economic harm and have incurred substantial additional costs to address medical and mental health care injuries and needs that they could not reasonably avoid.

ORIGINAL COMPLAINT FOR DAMAGES

LM LAW GROUP, PLLC
2806 Fredericksburg Rd., Ste. 118
San Antonio, TX 78201
Tel. 210.396.2045

235.    The increased risk of mass violence perpetrated by adolescent and young men caused by Daniel Defense's marketing practices is not outweighed by any countervailing benefits to consumers or competition. Daniel Defense could cease marketing its AR-15 rifles to adolescent and young men through appeals to the military and the offensive combat capabilities of its rifles without creating a burden on itself or any other individual or entity. Instead, it has continued these activities after being confronted with the tragic consequences of its marketing strategy.

236.    Ramos's purchase of the especially lethal and destructive Daniel Defense DDM4 V7 rifle to carry out the massacre at Robb Elementary was, upon information and belief, influenced by Daniel Defense's marketing as described above, and the result was a more lethal attack, more carnage, and greater pain and suffering.

237.    These knowing violations of the FTC Act were a proximate cause of Ramos's purchase and decision to use the Daniel Defense DDM4 V7 rifle and the injuries to M.Z. and K.T., both physical and psychological, and the psychological distress suffered by Christina and Ruben Zamora and Jamie Torres.

238.    Daniel Defense also caused, through its negligence, Christina and Ruben Zamora to suffer emotional pain and suffering, economic losses, including considerable financial expense for medical and mental healthcare and treatment, and diminished income capacity, and they will continue to incur these losses and expenses in the future.

239.    Daniel Defense also caused, through its negligence, Jamie Torres to suffer emotional pain and suffering, economic losses, including considerable financial expense for medical and mental healthcare and treatment, and diminished income capacity, and she will continue to incur these losses and expenses in the future.

LM LAW GROUP, PLLC
2806 Fredericksburg Rd., Ste. 118
San Antonio, TX  78201
Tel. 210.396.2045

ORIGINAL COMPLAINT FOR DAMAGES

## SECOND CAUSE OF ACTION
### Negligence Per Se
(By Plaintiffs Christina and Ruben Zamora, individually and as next friends of M.Z.; and Jamie Torres, individually and as next friend of K.T.; Against Defendant Daniel Defense)

240.     Plaintiffs incorporate and re-allege the above paragraphs as if stated fully here.

241.     In addition to manufacturing firearms, Daniel Defense is a "dealer" of firearms, as defined in 18 U.S.C. § 921(a)(11).

242.     By marketing the illegal misuse of its products, Daniel Defense violates the FTC Act, which prohibits "unfair or deceptive acts or practices in or affecting commerce." 15 U.S.C. § 45(a)(1). An unfair act or practice "causes or is likely to cause substantial injury to consumers which is not reasonably avoided by consumers themselves and not outweighed by countervailing benefits to consumers or competition."  15 U.S.C. § 45(n).

243.     Daniel Defense marketed its rifles in a manner that encourages illegal activities, namely engaging in offensive combat, against civilians, on American soil. It targets this marketing at the group most likely to engage in violent and/or impulsive behavior: adolescent and young men.

244.     These marketing practices proximately caused the harms suffered by Plaintiffs.

245.     Plaintiffs are consumers who could not reasonably avoid the injuries caused by these marketing practices.

246.     The risk of injury from Daniel Defense's marketing is not outweighed by benefits to consumers or competition. Daniel Defense chose to push the envelope in its marketing strategy to gain "notoriety." There is no reason Daniel Defense could not focus its marketing on the lawful uses of its products.

LM LAW GROUP, PLLC
2806 Fredericksburg Rd., Ste. 118
San Antonio, TX  78201
Tel. 210.396.2045

ORIGINAL COMPLAINT FOR DAMAGES

247.     The Plaintiffs are within the class of people that the FTC Act is designed to protect. This claim is thus exempted from immunity conferred by the Protection of Lawful Commerce in Arms Act, 15 U.S.C. § 7902.

## THIRD CAUSE OF ACTION
Negligent Transfer
(By Plaintiffs Christina and Ruben Zamora, individually and as next friends of M.Z.; and Jamie Torres, individually and as next friend of K.T.; Against Defendant Oasis Outback, LLC)

248.     Plaintiffs incorporate and re-allege the above paragraphs as if stated fully herein.

249.     Defendant Oasis Outback had a duty to exercise reasonable care in transferring firearms, including AR-15-style rifles, and to refrain from engaging in any activity creating reasonably foreseeable risks of injury to others.

250.     Defendant Oasis Outback's transfer of the Daniel Defense DDM4 V7 rifle to Ramos breached its duty to exercise reasonable care.

251.     Despite his youth and having just turned 18 days before, Ramos spent thousands of dollars on multiple guns and large quantities of ammunition at and through Oasis Outback over a four-day period, which was so unusual that it caused Oasis Outback's owner to question Ramos as to where he got the money.

252.     Other patrons at the store noticed Ramos acting unusual and nervous during these repeat visits. He dressed in all black and, as one customer described him, he looked "like one of those school shooters."

253.     Oasis Outback knew or reasonably should have known that Ramos was a dangerous person who was likely to use the rifle he obtained from Oasis Outback for unlawful purposes, including to injure and kill people.

LM LAW GROUP, PLLC
2806 Fredericksburg Rd., Ste. 118
San Antonio, TX  78201
Tel. 210.396.2045
ORIGINAL COMPLAINT FOR DAMAGES

254.    Oasis Outback enhanced the rifle it transferred to Ramos, by installing a holographic sight, thereby making it even more dangerous

255.    Oasis Outback has the right to refuse service to anyone.

256.    Oasis Outback is a licensed seller of firearms. It transferred a firearm to Ramos when it knew, or reasonably should have known, that the person to whom the firearm being supplied, Ramos, was likely to use the product in a manner involving unreasonable risk of physical injury to other persons; and in fact, Ramos did so use it. This claim is thus exempted from immunity conferred by the Protection of Lawful Commerce in Arms Act, 15 U.S.C. § 7902.

257.    These acts were a but for and proximate cause of the injuries to M.Z. and K.T., both physical and psychological, and the psychological distress suffered by Christina and Ruben Zamora and Jamie Torres.

258.    Oasis Outback also caused, through its negligence, Christina and Ruben Zamora to suffer emotional pain and suffering, economic losses, including considerable financial expense for medical and mental healthcare and treatment, and diminished income capacity, and they will continue to incur these losses and expenses in the future.

259.    Oasis Outback also caused, through its negligence, Jamie Torres to suffer emotional pain and suffering, economic losses, including considerable financial expense for medical and mental healthcare and treatment, and diminished income capacity, and she will continue to incur these losses and expenses in the future.

## FOURTH CAUSE OF ACTION
Negligent Sale
(By Plaintiffs Christina and Ruben Zamora, individually and as next friends of M.Z.; and Jamie Torres, individually and as next friend of K.T.; Against Defendant Oasis Outback, LLC)

260.    Plaintiffs incorporate and re-allege the above paragraphs as if stated fully herein.

261.    Defendant Oasis Outback had a duty to exercise reasonable care in selling firearms and ammunition, including AR-15 rifles, and to refrain from engaging in any activity creating reasonably foreseeable risks of injury to others.

262.    Defendant Oasis Outback's sales of ammunition and an AR-15-style rifle to Ramos breached its duty to exercise reasonable care.

263.    Despite his youth and having just turned 18 days before, Ramos spent thousands of dollars on multiple guns and large quantities of ammunition at and through Oasis Outback over a four-day period, which was sufficiently unusual that it caused Oasis Outback's owner to question Ramos as to where he got the money.

264.    Other patrons at the store noticed Ramos acting unusual and nervous at the store during these repeat visits. He dressed in all black and, as one customer described him, he looked "like one of those school shooters."

265.    Oasis Outback knew or reasonably should have known that Ramos was a dangerous person who was likely to use the firearms and ammunition he obtained from Oasis Outback for unlawful purposes, including to injure and kill people.

266.    Oasis Outback has the right to refuse service to anyone.

267.    Oasis Outback is a licensed seller of firearms. It sold ammunition and a firearm to Ramos when it knew, or reasonably should have known, that the person to whom the ammunition and firearm being supplied, Ramos, was likely to use the product in a manner involving unreasonable risk of physical injury to other persons; and in fact, Ramos did so use it. This claim is thus exempted from immunity conferred by the Protection of Lawful Commerce in Arms Act, 15 U.S.C. § 7902.

LM LAW GROUP, PLLC
2806 Fredericksburg Rd., Ste. 118
San Antonio, TX  78201
Tel. 210.396.2045

ORIGINAL COMPLAINT FOR DAMAGES

268.     These acts were a but for and proximate cause of the injuries to M.Z. and K.T., both physical and psychological, and the psychological distress suffered by Christina and Ruben Zamora and Jamie Torres.

269.     Oasis Outback also caused, through its negligence, Christina and Ruben Zamora to suffer emotional pain and suffering, economic losses, including considerable financial expense for medical and mental healthcare and treatment, and diminished income capacity, and they will continue to incur these losses and expenses in the future.

270.     Oasis Outback also caused, through its negligence, Jamie Torres to suffer emotional pain and suffering, economic losses, including considerable financial expense for medical and mental healthcare and treatment, and diminished income capacity, and she will continue to incur these losses and expenses in the future.

### **FIFTH CAUSE OF ACTION**
42 U.S.C. § 1983 – Fourth and Fourteenth Amendments
Unlawful Seizure
(By All Plaintiffs Against Law Enforcement Individual Defendants in their individual capacities,
and Defendants Arredondo, Pargas, and Nolasco in their official capacities)

271.     Plaintiffs incorporate and re-allege the above paragraphs as if stated fully herein.

272.     The Fourth Amendment to the Constitution of the United States protects individuals, including Plaintiff, from unreasonable seizures at the hands of law enforcement. This protection has been incorporated as against state and local actors, via the Fourteenth Amendment.

273.     By using force and authority to involuntarily confine M.Z., K.T., and other students and teachers inside classrooms 111 and 112 with Ramos, the Law Enforcement Individual Defendants illegally seized M.Z. and K.T. in violation of the clearly established rights secured to them by the Fourth and Fourteenth Amendments.

LM LAW GROUP, PLLC
2806 Fredericksburg Rd., Ste. 118
San Antonio, TX  78201
Tel. 210.396.2045
ORIGINAL COMPLAINT FOR DAMAGES

274.     The Law Enforcement Individual Defendants were deliberately indifferent to the

constitutional rights of M.Z., K.T., and the other victims of the shooting at Robb Elementary.

275.     As a direct and proximate result of the Law Enforcement Individual Defendants'

misconduct detailed above, Plaintiffs Christina Zamora, Ruben Zamora, M.Z., Jamie Torres, and

K.T. sustained the damages alleged herein.

## **SIXTH CAUSE OF ACTION**
42 U.S.C. § 1983 – Fourteenth Amendment
Substantive Due Process – State Created Danger & Custodial Relationship
(By All Plaintiffs Against Law Enforcement Individual Defendants in their individual capacities,
and Defendants Arredondo, Pargas, and Nolasco in their official capacities)

276.     Plaintiffs incorporate and re-allege the above paragraphs as if stated fully herein.

277.     The Fourteenth Amendment to the Constitution of the United States creates a right

to not be deprived of life without due process of law.

278.     While this protection may not always require governmental actors to protect the

public from private actors, where harm inflicted by a private party also flows from a danger a state

actor has knowingly created, that violates the Fourteenth Amendment's substantive due process

protections.

279.     A second exception to the rule exists where individuals are in the custody of the

state. In cases in which an individual is in the custody of the state, the state has a duty of care

towards that individual.

280.     By using force to barricade M.Z., K.T., and other students and teachers inside

classrooms 111 and 112 with Ramos, the Law Enforcement Individual Defendants illegally created

a dangerous environment for M.Z. and K.T. in which they were stripped of means to defend

LM LAW GROUP, PLLC
2806 Fredericksburg Rd., Ste. 118
San Antonio, TX  78201
Tel. 210.396.2045
ORIGINAL COMPLAINT FOR DAMAGES

themselves and cut off from sources of aid and rescue, in violation of the rights secured to them by the Fourteenth Amendment.

281.    M.Z. and K.T. were in the custody of the Law Enforcement Individual Defendants because they took steps to "establish a perimeter," and also stood in the hallway involuntarily barricading them within classrooms 111 and 112. The Law Enforcement Individual Defendants thus had a duty of care to M.Z. and K.T. which they breached by delaying their entry to the classroom for well over an hour, thus denying them access to rescue and emergency medical services.

282.    The Law Enforcement Individual Defendants were deliberately indifferent to the constitutional rights of M.Z., K.T., and the other victims of the shooting at Robb Elementary.

283.    As a direct and proximate result of the Law Enforcement Individual Defendants' misconduct detailed above, Plaintiffs sustained the damages alleged herein.

## SEVENTH CAUSE OF ACTION
42 U.S.C. § 1983 – Fourth and Fourteenth Amendments – Unlawful Seizure
*Monell* Liability – Failure to Train; Creation of Policy
(By All Plaintiffs Against Defendants Arredondo, in his official capacity; Pargas, in his official capacity; Nolasco, in his official capacity; Uvalde Consolidated Independent School District; City of Uvalde; and Uvalde County.)

284.    Plaintiffs incorporate and re-allege the above paragraphs as if stated fully herein.

285.    A municipality may be held liable under 42 U.S.C. § 1983 for "failure to supervise or train," where "(1) the supervisor either failed to supervise or train the subordinate official; (2) a causal link exists between the failure to train or supervise and the violation of the plaintiff's rights; and (3) the failure to train or supervise amounts to deliberate indifference." *Goodman v. Harris County*, 571 F.3d 388, 395 (5th Cir. 2009).

LM LAW GROUP, PLLC
2806 Fredericksburg Rd., Ste. 118
San Antonio, TX  78201
Tel. 210.396.2045
ORIGINAL COMPLAINT FOR DAMAGES

286.    After the Columbine school shooting in 1999, 23 years before the events at Robb Elementary School, law enforcement nationwide changed tactics on active shooter situations inside schools—first responders began being trained to "immediately make entry and neutralize an active shooter threat." Another adaptation was the "Priority of Life Scale" which provided that saving the lives of innocent civilians come before the lives of law enforcement and other responders.

287.    Despite these national standards, the Uvalde Police Department, the Uvalde Consolidated Independent School District-Police Department, and the Uvalde County Sheriff's Office failed to ensure that their police officers were adequately trained and failed to develop meaningful plans to address an active shooter incident. Half of the Uvalde Police Department officers and only 20% of Uvalde County Sheriff's Office employees had received active shooter training as of May 24, 2022.

288.    This lack of training and egregious delay in response showed that Defendants Arredondo, Pargas, and Nolasco were deliberately indifferent to the Fourth and Fourteenth Amendment rights of M.Z., K.T., and the other students and teachers whom they knew to be trapped inside classrooms 111 and 112.

289.    The failure to follow the active shooter trainings and policies by Defendants Arredondo, Pargas, and Nolasco and the responding Law Enforcement Individual Defendant officers was the driving force behind and actual cause of M.Z.'s and K.T.'s constitutional injuries.

290.    The Law Enforcement Municipal Defendants failed to adequately train, supervise, and discipline the Law Enforcement Individual Defendants regarding how to identify and respond to an active shooter situation. The result was that law enforcement officers employed by the Law Enforcement Municipal Defendants used force and authority to involuntarily barricade M.Z., K.T.,

LM LAW GROUP, PLLC
2806 Fredericksburg Rd., Ste. 118
San Antonio, TX 78201
Tel. 210.396.2045

ORIGINAL COMPLAINT FOR DAMAGES

and other students and teachers inside classrooms 111 and 112 with Ramos, and the Law Enforcement Individual Defendants illegally seized M.Z. and K.T., in violation of the clearly established rights secured to them by the Fourth and Fourteenth Amendments.

291.    By virtue of these actions, the Law Enforcement Municipal Defendants were deliberately indifferent to the constitutional rights of M.Z., K.T., and the other victims of the shooting at Robb Elementary.

292.    As a direct and proximate result of the failure to adequately train, supervise, and discipline the Law Enforcement Individual Defendants regarding how to identify and respond to an active shooter situation, Plaintiffs sustained the damages alleged herein.

293.    A municipality may also be held liable under 42 U.S.C. § 1983 for action taken pursuant to a municipal policy. "A single decision by a policy maker may, under certain circumstances, constitute a policy for which the County may be liable." *Brown v. Bryan County*, 219 F.3d 450, 462 (5th Cir. 2000).

294.    Defendant Arredondo, as Chief of Police for the Uvalde Consolidated Independent School District Police Department (UCISD-PD), was a final policymaker for the Uvalde Consolidated Independent School District with regard to the tactics, arrests, and training of UCISD-PD officers at all relevant times herein.

295.    Defendant Pargas, as Acting Chief of Police for the Uvalde Police Department (UPD), was a final policymaker for the City of Uvalde with regard to the tactics, arrests, and training of UPD officers at all relevant times herein.

LM LAW GROUP, PLLC
2806 Fredericksburg Rd., Ste. 118
San Antonio, TX  78201
Tel. 210.396.2045

ORIGINAL COMPLAINT FOR DAMAGES

296.     Defendant Nolasco, as Sheriff of Uvalde County, was a final policymaker for the County of Uvalde with regard to the tactics, arrests, and training of UCSO officers at all relevant times herein.

297.     Defendants Arredondo, Pargas, and Nolasco, acting as final policymakers, decided to disregard the active shooter policy and instituted a policy that was the exact opposite of "stop the killing and then stop the dying" and all other written active shooter policies. Their new policy was to barricade M.Z., K.T., and the other students and teachers inside two classrooms with a killer, thus seizing them unreasonably and depriving them of emergency medical and rescue services and the comfort of their loved ones.

298.     As a direct and proximate result of this policy, Plaintiffs sustained the damages alleged herein.

### EIGHTH CAUSE OF ACTION
42 U.S.C. § 1983 – Fourteenth Amendment
Substantive Due Process – State Created Danger & Custodial Relationship
*Monell* Liability – Failure to Train; Creation of Policy
(By All Plaintiffs Against Law Enforcement Municipal Defendants)

299.     Plaintiffs incorporate and re-allege the above paragraphs as if stated fully herein.

300.     A municipality may be held liable under 42 U.S.C. § 1983 for "failure to supervise or train," where "(1) the supervisor either failed to supervise or train the subordinate official; (2) a causal link exists between the failure to train or supervise and the violation of the plaintiff's rights; and (3) the failure to train or supervise amounts to deliberate indifference." *Goodman v. Harris County*, 571 F.3d 388, 395 (5th Cir. 2009).

ORIGINAL COMPLAINT FOR DAMAGES

LM LAW GROUP, PLLC
2806 Fredericksburg Rd., Ste. 118
San Antonio, TX  78201
Tel. 210.396.2045

301.    For the reasons set forth above, the Law Enforcement Individual Defendants have violated M.Z.'s and K.T.'s rights under the Fourteenth Amendment to the United States Constitution.

302.    The Law Enforcement Municipal Defendants failed to adequately train, supervise, and discipline the Law Enforcement Individual Defendants regarding how to identify and respond to an active shooter situation. The result was that law enforcement officers employed by the Law Enforcement Municipal Defendants used force to barricade M.Z., K.T., and other students and teachers inside classrooms 111 and 112 with Ramos and illegally created a dangerous environment for M.Z. and K.T. in which they were stripped of means to defend themselves and cut off from sources of aid and rescue, in violation of the rights secured to them by the Fourteenth Amendment. Further, M.Z. and K.T. were in the custody of law enforcement officers employed by the Law Enforcement Municipal Defendants because they took steps to "establish a perimeter," and also stood in the hallway involuntarily barricading them within classrooms 111 and 112. This denied her access to emergency medical and rescue services. And additionally, the custom of disregarding safety policies, including maintaining and locking doors, placed M.Z. and K.T. in greater peril than they would have been otherwise.

303.    By virtue of these actions, the Law Enforcement Municipal Defendants were deliberately indifferent to the constitutional rights of M.Z., K.T., and the other victims of the shooting at Robb Elementary.

304.    As a direct and proximate result of the failure to adequately train, supervise, and discipline the Law Enforcement Individual Defendants regarding how to identify and respond to an active shooter situation, Plaintiffs sustained the damages alleged herein.

LM LAW GROUP, PLLC
2806 Fredericksburg Rd., Ste. 118
San Antonio, TX  78201
Tel. 210.396.2045

ORIGINAL COMPLAINT FOR DAMAGES

305.     A municipality may also be held liable under 42 U.S.C. § 1983 for action taken pursuant to a municipal policy. "A single decision by a policy maker may, under certain circumstances, constitute a policy for which the County may be liable." *Brown v. Bryan County*, 219 F.3d 450, 462 (5th Cir. 2000).

306.     Defendants Arredondo, Pargas, and Nolasco acting as final policymakers, decided to disregard the active shooter policy and instituted a policy to barricade M.Z., K.T., and the other students and teachers inside classrooms with a killer, thus taking them into their custody and increasing the danger to them, while also depriving them of emergency medical and rescue services and the comfort of their loved ones.

307.     As a direct and proximate result of this policy, Plaintiffs sustained the damages alleged herein.

## VI.
## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request judgment against Defendants as follows:

   a.   Compensatory damages against all Defendants in an amount to be determined at trial;

   b.   Punitive damages against the Gun Industry Defendants and the Law Enforcement Individual Defendants in an amount to be determined at trial;

   c.   Reasonable attorneys' fees and costs under 42 U.S.C. § 1988;

   d.   Pre- and post-judgment interest; and

   e.   Such other and further relief as this Court may deem just and proper.

**PLEASE TAKE NOTICE THAT PLAINTIFFS DEMAND A TRIAL BY JURY.**

DATED: February 22, 2023                    Respectfully Submitted,

                                            */s/ Blas H. Delgado*     

**EVERYTOWN LAW**                           **LM LAW GROUP, PLLC**
Eric Tirschwell (application for admission  David Lopez (application for admission
forthcoming)                                forthcoming)
Molly Thomas-Jensen (application for admission   2806 Fredericksburg Rd., Ste. 118
forthcoming)                                San Antonio, TX 78201
Ryan Gerber (application for admission      210-396-2045
forthcoming)                                Moreno.LMLawGroup@gmail.com
Laura Keeley (application for admission
forthcoming)                                **LAW OFFICES OF BLAS DELGADO, P.C**.
450 Lexington Avenue, P.O. Box #4184        Blas H. Delgado
New York, NY 10017                          2806 Fredericksburg Rd., Ste. 116
646-324-8226                                San Antonio, TX 78201
etirschwell@everytown.org                   210-227-4186
mthomasjensen@everytown.org                 delgadoblas@yahoo.com
rgerber@everytown.org
lkeeley@everytown.org

**ROMANUCCI & BLANDIN, LLC**
David A. Neiman (*pro hac vice* forthcoming)
Sarah M. Raisch (*pro hac vice* forthcoming)
321 N. Clark Street, Suite 900
Chicago, IL 60654
Tel: (312) 458-1000
Fax: (312) 458-1004
dneiman@rblaw.net
sraisch@rblaw.net

ORIGINAL COMPLAINT FOR DAMAGES